## CABINET FOR HEALTH AND FAMILY, Appellant

v.

## J.M.G., et al., Appellees.

## 2013–SC–000797–DG

Supreme Court of Kentucky.

RENDERED: DECEMBER 17, 2015

COUNSEL FOR APPELLANT: Mona Sabie Womack, Deputy General Counsel, Cabinet for Health and Family Services

COUNSEL FOR APPELLEES: No appearance by Counsel for Appellees

OPINION OF THE COURT BY JUSTICE ABRAMSON

The Kentucky Cabinet for Health and Family Services ("CHFS" or "the Cabinet") has requested review of an Opinion by a divided panel of the Court of Appeals upholding the Fayette Family Court's imposition of criminal contempt sanctions against the Cabinet—sanctions in the form of a $2,000 fine. The Family Court deemed sanctionable the Cabinet's (a social worker's or social workers') failure in sibling Dependency, Neglect, and Abuse (DNA) actions (KRS Chapter 620) to file a statutorily mandated report and, in the subsequent Termination of Parental Rights actions (KRS Chapter 625), the Cabinet's (an attorney's) failure to request a pre-hearing conference as mandated by the Family Court Rules. The Cabinet concedes the alleged procedural lapses, but argues that in the circumstances of these cases the lapses do not amount to criminal contempt. We granted the Cabinet's request for review to consider the merits of its concern, a concern shared by the dissenting Court of Appeals Judge, that the Family Court should have ordered compliance with the statute and the rule before resorting to contempt proceedings. We also accepted review to broach important, but unaddressed, questions concerning the Cabinet's liability for the contempts of its agents, its immunity from fines for criminal contempt, and the procedures to which a party charged with criminal contempt is entitled. Agreeing with the Cabinet that the Family Court's contempt rulings cannot be upheld as entered, we reverse the Opinion of the Court of Appeals and remand in part to the trial court.

*RELEVANT FACTS*

The underlying DNA cases concern two siblings, Janie and Charles Goins,[1] the children of Sabrina and Gregory Goins. Janie was born in October 2004, Charles in March 2008. Sometime prior to July 2010, Sabrina and Gregory, were both incarcerated, with Sabrina having been convicted of possession of a forged instrument, fraudulent use of a credit card, and sec-

---

1. 1 In keeping with this Court's practice, "Ja- nie" and "Charles" are pseudonyms.

ond-degree robbery and Gregory having been convicted of possession of a controlled substance and escape. The children were left in the care of Gregory's sister, Jamie Overpeck, a resident of Lexington.

On July 2, 2010, Ms. Overpeck was herself arrested on drug charges. The arresting officers contacted the Lexington/Fayette branch of the Department of Community Based Services, and that Department arranged for the intervention of a social worker. The social worker promptly (that day), on behalf of the Cabinet, sought and was granted a Family Court Order allowing the Cabinet to take the children into its emergency cus-

tody.[2] The children were placed with a foster couple.

Over the next eight weeks, a temporary removal hearing, an adjudication hearing, and a disposition hearing followed in due course. At each stage the Family Court accepted the Cabinet's representations that, owing to the parents' and Ms. Overpeck's incarcerations, the children were "neglected"[3] for the purposes of KRS Chapter 620.[4]

Initially, in what it styled a "Dispositional Report,"[5] but what was in effect the initial permanency plan coinciding with the disposition hearing in August 2010, the Cabinet recommended that the children be

---

2. KRS 620.060 authorizes the court to issue ex parte emergency custody orders, effective for seventy-two hours, when the court is presented with reasonable grounds to believe that removal is in the best interest of the child because, among other reasons, "the parents or other person exercising custodial control or supervision are unable or unwilling to protect the child[, and] ... [t]he child is in immediate danger due to the parents' failure or refusal to provide for the safety or needs of the child." KRS 620.060(1)(c).

3. KRS 600.020(1) defines "abused and neglected child" in part as "a child whose health or welfare is harmed or threatened with harm when: ... (a) His or her parent ... or other person exercising control or supervision of the child: ... 4. Continuously or repeatedly fails or refuses to provide essential parental care and protection for the child, ... [or] 8. Does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being."

4. KRS 620.070 provides that a DNA action "may be commenced by the filing of a petition by any interested person in the juvenile session of the District Court." In this case the petition was filed on July 2, 2010 by the Cabinet's social worker. KRS 620.080 requires a temporary removal hearing within seventy-two hours, excluding weekends and holidays, of the emergency custody order.

This hearing is essentially a probable cause hearing with the burden of proof on the Commonwealth. KRS 620.090 establishes the dispositional alternatives allowed in temporary custody orders. The temporary removal hearing was held on July 7, 2010, and the court found reasonable grounds to believe that the children would be neglected if returned to their parents or to the person who had been exercising custodial control. Temporary custody, accordingly, was granted to the Cabinet. The adjudication hearing (KRS 620.100) is the proceeding at which the court "determine[s] the truth or falsity of allegations in the complaint." KRS 620.100(3). The burden of proof is on the complainant. Following a hearing on July 26, 2010; the court found the children to be neglected. KRS 610.080 requires that in juvenile proceedings adjudication and disposition hearings be separate and distinct. A separate disposition hearing, accordingly, was held on August 25, 2010, and pursuant to KRS 620.140, which provides for dispositional alternatives in DNA actions, the court ordered that the children were to remain committed to the Cabinet.

5. KRS 620.230 requires the Cabinet to file a "case permanency plan" within thirty days of the effective date of the order of commitment. The plan is to account for the initial placement of the child, to recommend a permanency goal, and to suggest those goal-advancing steps the Cabinet believes are feasible during the next six months.

kept in temporary foster care with a goal of "Return to Parent"—a goal, essentially, of "Return to Mother," since Sabrina was serving the shorter sentence. She was due to be released from prison, according to the Cabinet, in about July 2011. Gregory was not due to be released for at least a year beyond that, and therefore the Cabinet sought and was granted a waiver of its obligation to provide reunification services to him.[6]

At the August 2010 disposition hearing, however, the children's guardian ad litem (GAL) objected to a plan that required the children to spend a year with foster parents who were too old (about seventy) to be interested in adoption, when reunification with the mother at the end of that year was unlikely at best. It was the GAL's view that even if reunification with the mother remained a possibility, an adoption alternative could and should be pursued simultaneously in case reunification with the mother did not succeed.

Noting that such "concurrent planning" is indeed a part of the current legal landscape, see Kathleen S. Bean, *Aggravated Circumstances, Reasonable Efforts, and A[doption and] S[afe] F[amilies] A[ct]*, 29

Boston College Third World Law Journal 223, 250 n.194 (2009) (*Aggravated Circumstances*) (citing 42 U.S.C. § 675(E)'s requirement that concurrently with reunification efforts the state "identify, recruit, process, and approve a qualified family for adoption"), the court shared the GAL's concerns. Thus, while accepting provisionally the Cabinet's plan to reunify the children with their mother, it indicated that it would refer the case for review to the Fayette County Interested Party Review Board,[7] would give the Cabinet's case workers an opportunity to consult with the Cabinet's Office of Legal Services, and would reconsider the Cabinet's proposed plans for the children in October.[8]

In early October 2010, the Fayette County Interested Party Review Board responded to the court's referral with a report highly critical of both the Cabinet's plan for the children and its failure to support the foster parents. In the course of recommending that the goal for the children be changed unequivocally to adoption and that the children be provided with medical and dental services, the Board asserted that "[t]hese children have been

**6.** KRS 620.130 provides in part that "[i]f the court orders the removal or continues the removal of the child, services provided to the parent and the child shall be designed to promote the protection of the child and the return of the child safely to the child's home as soon as possible." Such reunification services need amount to, but only to, "reasonable efforts" by the Cabinet "to enable the child to safely live at home." KRS 620.020(11) and (12) (defining "reasonable efforts" and "reunification services," respectively). KRS 610.127(1), however, provides that reasonable efforts at reunification are not required if the court determines that the parent has subjected the child to "aggravated circumstances," which KRS 600.020(2) defines as including the parent's unavailability to care for the child due to incarceration for at least one year from the date of the child's entry into foster care.

**7.** KRS 620.190—KRS 620.290 establishes a Citizen Foster Care Review Board program within the Administrative Office of the Courts and provides for the appointment of local boards within each judicial district.

**8.** KRS 610.125 provides in part that (1) "[i]f a child has been removed from the home and placed in the custody of ... the cabinet, a judge of the District Court shall conduct a permanency hearing no later than twelve (12) months after the date the child is considered to have entered foster care, and every twelve (12) months thereafter if custody and out-of-home placement continues, to determine the future status of the child.... (6) Upon conclusion of the hearing the court shall make a written order determining the permanency plan for the child."

failed by the system." A video recording of the ensuing October 11, 2010 permanency hearing has not been included in the record provided to us, but the upshot of that hearing, on paper at least (see Cabinet reports from October 11 (a revised permanency plan proposal) and November 8, 2010 (a report styled "Review Report," a sort of progress report[9])), was the Cabinet's recommendation of adoption (not return to parent) as the goal for the children and its facilitating the children's access to various social services, including medical and dental care.

The Family Court incorporated the Cabinet's adoption recommendation in its permanency-plan Order of October 11, 2010. It appears to have been the court's understanding that a prompt petition to terminate the parents' parental rights would make adoption possible soon enough to obviate any immediate change in the children's foster placement, the foster parents by all accounts having provided excellent care for the two children as well as having established affectionate bonds with them. Accordingly, the court also granted a waiver of reunification efforts with respect to Sabrina (a waiver having already been granted with respect to Gregory) and scheduled a "TPR review" (termination of parental rights review) for December 20. In a brief proceeding on December 20, however, the court liaison for the Cabinet reported merely that the TPR petition had not yet been filed. "TPR review" was therefore rescheduled for the end of January 2011.

At the review in January 2011 and again in March, April, and June of that year, the Cabinet's statement was the same: "[The] TPR [petition] has not been filed." Nor had it been filed as of July, when the Cabinet informed the court that Sabrina had been released from prison and wanted to be reunited with her children. At that point (July 2011), the Cabinet filed a progress report acknowledging that adoption was the designated goal for the children and that reunification services had been waived for the mother, but making it plain that the Cabinet favored giving the mother an opportunity to be reunited with her children and indicating that with the Cabinet's aid she had begun attempts to reestablish visitation with them. The court, however, summarily dismissed Cabinet inquiries about how the mother might reestablish her eligibility for reunification services and indicated that the mother's claims should now be addressed in the TPR action.

Nevertheless, apparently upon the advice of Cabinet case workers, in August 2011 Sabrina moved, on her own behalf, for the appointment of counsel and to have the court's waiver of reunification efforts lifted so that the Cabinet would be authorized to work with her toward a goal of reunification. Denying those motions at a hearing in September, a clearly exasperated court explained that while a TPR petition had yet to be filed, the filing was imminent, and in any event the case had long since effectively progressed past the

9. In addition to its initial recommendation of a permanency plan, noted above (KRS 620.230), the Cabinet is responsible, under KRS 620.240, for filing "for each child a case progress report at least once every six (6) months with the court and the Administrative Office of the Courts Citizen Foster Care Review Board Program." The report is to include such information as the length of time the child has been in the Cabinet's custody; the number of placements during that time; the barriers to returning the child to his or her parents; a timetable for permanent placement, whether that be a return to the parents or otherwise; and, "[i]f return home is not recommended, a specific recommendation for a permanent placement, including termination of parental rights if appropriate." KRS 620.240(1)-(9).

disposition phase of the neglect action and into an adjudication of parental rights. In that action, the court assured Sabrina, she could have appointed counsel and would be afforded a full opportunity to argue for the return of. her children. In the meantime, the court continued, Sabrina was subject to drug testing, and it entered an order to that effect.

Notwithstanding the court's expectation that the termination action would promptly move forward, the Cabinet representative reported at brief TPR review proceedings in October and November 2011 that the TPR petition still had not been filed. By that point, the Cabinet's lack of progress implicated federal law, for as of September 26, 2011 the children had been in foster care for fifteen of the last twenty-two months, a trigger, or potential trigger at least, under federal statutes for the mandatory filing of a TPR petition.[10]

When at the next TPR review proceeding on January 3, 2012, the Cabinet still had not filed the TPR petition, the court declared that enough was enough. It ordered the Cabinet to appear by counsel at a status hearing in two weeks. At that hearing on January 17, 2012, Cabinet counsel did not appear, but the court acknowledged having spoken with counsel

three or four days previously and expressed the understanding that counsel had assured the court that the TPR petition had been filed. The social worker present at the hearing confirmed that she had prepared the TPR petition and given it to counsel, and that they (the Cabinet) were only "waiting on a date." The court then stated, without correction by the Cabinet personnel then present, "So I will indicate TPR filed, no further orders in the J case, and we will just proceed in the AD case."

With the "J" case (the district court neglect case) thus superseded, as the court believed, by the "AD" case (the circuit court termination of rights case), TPR reviews in the "J" case ceased, and the case languished until July 2012. On July 16, it appears, the court held the (second) annual permanency review in the "J" case,[11] and at that hearing or in the Cabinet's progress report, which was filed on July 17, the court learned, apparently, that still no progress had been made in the termination of rights action. To find out why, on July 17 the court again ordered a status conference, this one for September 9, 2012, and again ordered that a Cabinet attorney be present at that conference. Again, however, when that conference was convened on the appointed day,[12] the Cabinet's attorney

---

**10.** 42 U.S.C. § 675(E)(5)(E) provides in part that "in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months . . . the State shall file a petition to terminate the parental rights of the child's parents." *See also* KRS 625.090(2)(j), which makes foster care under the responsibility of the Cabinet for fifteen of the most recent twenty-two months a potential ground for the termination of parental rights.

**11.** As noted above, KRS 610.125 requires the court to hold a permanency hearing at least every twelve months after the child enters foster care. *See also* Family Court Rule of Practice and Procedure (FCRPP) 23 (annual permanency hearing "shall not be continued

beyond 12 months from the placement of the child in foster care for any reason, including good cause."). Again the record provided us does not include a video recording of the July 16 proceeding. The record includes a July 16, 2012 video apparently involving different Goins children in a different matter, but not the annual review hearing involving Janie and Charles Goins. We base our understanding of what took place in the annual review proceeding on references to it made by the court and by Cabinet employees at subsequent hearings.

**12.** Once again, we have not been provided the video record of the September 9 status conference. We have been provided with the video record of a proceeding later that same

did not appear. The Cabinet worker who did appear, furthermore, along with at least the father, Gregory (who was released from prison on parole in early August 2012), and Gregory's attorney, gave the court the impression that, as far as the Cabinet was concerned, the TPR action had been abandoned in favor of giving the parents an opportunity in the neglect action to regain custody of their children. In the course of that conference the court became aware that the TPR action ostensibly filed back in January 2012 had in fact not been filed until March 20, 2012, and that regardless of when filed had progressed no further than the filing.

The court thus had three questions on its mind later that same day when the Cabinet's attorney, its social worker, and its court liaison appeared before it: (1) Why had the court been told ("lied to") in January that the TPR petition had been filed when it had not been? (2) Why had the attorney not appeared in court that morning when he had been ordered to do so? and (3) Why had the TPR action never left the starting gate—was the father correct that the Cabinet, of its own accord and without word to anyone else, had in effect changed the permanency plan for Janie and Charles from adoption to a return to their parents?

The Cabinet personnel did their best to assure the court that misunderstandings and perhaps some negligence (including a failure by the liaison to forward the court's order to appear to the attorney)—but not lies or contumacy—had led to the attorney's failure to appear and to the apparent misrepresentation regarding the filing of the TPR petition. They also represented to the court that although the parents had

approached the case workers in hopes of being allowed to reunify with their children, the Cabinet's plan for the children remained adoption.

Notwithstanding these assurances, at the conclusion of the conference the court announced that it was ordering the Cabinet to show cause why it should not be held in contempt on four grounds: its attorney's failure to appear, as ordered, at case review conferences on January 17, 2012 and again on September 9, 2012; its case worker's representation to the court in January 2012 that a TPR petition had been filed when it had not been; its attorney's use of an unnotarized "affidavit" to support his request for a warning order attorney; and its attorney's failure to request a pretrial conference, as required by Family Court Rules of Procedure and Practice (FCRPP) 34(1), in conjunction with his filing of the TPR petition in March 2012. The court's subsequently entered written show-cause order added to these grounds three others: the Cabinet attorney's allegedly needless request for a warning order attorney; the case workers' failure to file a statutorily required case progress report; and the case workers' failure to obtain an exemption required under the federal Adoption and Safe Families Act (ASFA).[13]

The court did not assign the prosecution of the alleged contempt to an attorney, and so when the show-cause hearing convened on October 17, 2012, the court found itself in the somewhat awkward position of having to rely on advice from the Cabinet's counsel (at that point General Counsel for the Cabinet, not the regional attorney involved in the children's cases) as to such basic matters as who was the defendant

day during which the earlier status conference was discussed.

**13.** The Adoption and Safe Families Act of 1997, Pub.L. No. 105–89, 111 Stat. 2115, has been amended numerous times and is codified in scattered sections of 42 U.S.C.

and whether the proceeding was civil or criminal in nature. On the first issue, the court's order named no individual as defendant, neither a participant in the juvenile cases nor the Cabinet's Commissioner or Secretary, so General Counsel's view was that only the agency itself was a defendant, and since an agency could not be incarcerated the only potential remedy that suggested itself was a monetary fine. As to the second issue, the Cabinet's counsel disagreed with the court's initial assumption that the matter was civil and pointed out that contempt proceedings meant to punish past conduct, as appeared to be the gist of these proceedings, as opposed to proceedings meant to coerce compliance with an order or to compensate an opposing party injured by the breach of an order, are generally deemed to be criminal.

The court's dual role as both accuser and adjudicator also complicated briefing. The show cause order did not require the Cabinet to file an answer or a brief of any sort, and so the hearing commenced with the Court unaware of the Cabinet's defenses. When, just a few minutes into the proceeding, General Counsel for the Cabinet submitted written responses to each of the court's allegations of contempt, the court was obliged to continue the hearing to give itself an opportunity to consider the responses. At that point the GAL, who had appeared on behalf of the children, asked to be excused from any further involvement in the contempt proceedings, and the court granted his request.

The matter resumed about two weeks later, on November 1, 2012. At the outset of the hearing the Cabinet summarized its response to the court's allegations as, in general, twofold. The Cabinet conceded that the court had identified lapses in the Cabinet's handling of these cases, but, on the one hand, it denied that the lapses involved the violation of any court orders or otherwise amounted to defiance of the court and merited sanctions. On the other hand, the Cabinet asserted that it had instituted changes in its Fayette County offices designed to prevent similar lapses from recurring. Among those changes, according to counsel, the court liaison's duties had been altered slightly to insure timely filing of case progress reports and prompt notice to Cabinet attorneys of court orders and communications.

The court acknowledged the Cabinet's position and stated that it had fully anticipated being able to rule on the matter that day. Late the previous afternoon, however, the court announced, it had received from a Cabinet administrator an e-mail, the propriety of which, in the court's view, was open to serious question. In light of this e-mail, the court believed it might have an obligation to open the otherwise sealed proceedings to the public, and it therefore had decided to further continue the contempt proceeding to give the Cabinet an opportunity to respond to the court's new concern.

The e-mail, addressed to the four Fayette County Family Court Judges, requested their approval of and patience with a temporary withdrawal of certain social-worker supervisors from court attendance so that the supervisors could assist with an increased investigation caseload. Troubled, apparently, by what it perceived as an inconsistency between counsel's claims that the Cabinet sought to improve its cooperation with the Fayette Family Court and an implicit threat in the e-mail to scuttle a form of cooperation (the regular attendance of social-worker supervisors during the Family Court's DNA docket) achieved only with considerable effort in the past, the court referred the e-mail to the Cabinet's counsel (who had not been among the "copied" recipients). The

Family Court asked the General Counsel to show cause why the court should not open the otherwise sealed juvenile proceedings to the public so as to invite public scrutiny of what the court believed to be an improper attempt by a Cabinet higher-up to influence the contempt inquiry.

Counsel duly filed a response (denying that the e-mail had anything to do with the matter before the court), and the contempt hearing was opened for the third time on November 13, 2012. The hearing began with the court withdrawing its own motion to unseal the proceedings. It acknowledged that the parents had a right to be heard on that question, and since they had not been accorded that right the court had decided to let that question drop. The court also noted that a termination of rights hearing had finally been scheduled for the following January, a hearing the court did not want to risk compromising by unsealing the record.

The second matter the court took up was the alleged contempt. Acknowledging the oddness of a proceeding in which the court was itself a sort of party, the court asked if the Cabinet wished to put on any proof. Counsel for the Cabinet declined that opportunity, preferring to rely on the facts she asserted in her response to the court's show-cause order, but she did refer the court to three cases she deemed pertinent.[14] Having agreed to consider the Cabinet's response and its three newly cited cases, the court took the contempt issue under submission.

The court then devoted the last half of the fifteen minute hearing to what it referred to as the "e-mail issue," a reference to the e-mail discussed above that threatened, in the court's view, a sort of retaliation for the court's proceeding against the Cabinet in contempt. The court expressed its decided view that a certain level of Cabinet management resisted criticism from any source—affected parents, GALs, Cabinet employees, courts—with the result that improvement could not be achieved by measures short of contempt proceedings. More such proceedings, the court proclaimed, could be expected.

Not surprisingly, perhaps, given those sentiments, the next day the court issued its Order finding the Cabinet in contempt in both cases for (1) "fail[ing] to file the first required case progress report ... pursuant to KRS 620.240"; and (2) "fail[ing] to immediately obtain a pretrial conference date in the termination of parental rights case ... as required by FCRPP 34(1)." With respect to both provisions, the court found the Cabinet's omission to have been "willful[ly] disobedien[t]" and a demonstration of "open disrespect" for the laws and court rules of the Commonwealth. The court ordered the $2000 fine ($500 per contempt with two instances in each case) to be paid "to the office of the Fayette Circuit Clerk within ten days of the entry of this Order." The court also found that the Cabinet's other alleged misdeeds—its alleged failures, for example, to communicate accurately and forthrightly

14. According to counsel, she cited one of the cases, an unpublished Court of Appeals opinion, for the proposition that a person accused of criminal contempt is entitled to a jury trial and all the process ordinarily due in such a trial if incarceration for at least six months or a "serious" fine is a possible sanction. See *Riley v. Gibson*, 338 S.W.3d 230, 237 (Ky. 2011) (citing *Codispoti v. Pennsylvania*, 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974) for same proposition). Counsel did not, however, accompany this citation with a demand for more trial-like procedures, much less a jury trial. The point, rather, seems to have been that while the Cabinet acquiesced in the court's informal manner of proceeding, it did so only with the understanding that such proceedings could not give rise to a "serious" penalty.

with the court, to appear at hearings, to obtain a statutory exemption, to respect the warning order process—while not clearly willful enough to merit a contempt sanction, "were, at the very least, acts of neglect and lack of due diligence, ... which warrant a finding that the Cabinet has not made reasonable efforts to finalize a permanency plan for th[ese] child[ren] who ha[ve] now been in foster care since August of 2010." This last finding, according to the Cabinet, also amounts to a monetary sanction, since federal reimbursement for the costs of the children's care while in state custody is conditioned upon the state's having made "reasonable efforts to finalize a permanency plan for the children." [15]

The Cabinet sought review of the Family Court's contempt rulings in the Court of Appeals,[16] and as noted above, a divided panel of that Court upheld the sanctions as not an abuse of the trial court's "nearly unlimited discretion in its exercise of contempt powers." *Cabinet for Health & Family Services v. G.G.*, 2012–CA–002086–MR, p. 4, 2013 WL 5969854 (Ky.App. Nov. 8, 2013). In the view of the Court of Appeals' majority, the Cabinet's concessions that its employees failed to file the required report and to request the required pre-trial conference were alone enough to justify the Family Court's contempt rulings, since those failures by themselves, even if not accompanied by "malice" or "disrespect," were enough to constitute "willful disobedience" of the rules or orders of a court.

The Cabinet takes issue with that conclusion by insisting, as a general matter, that the violation of a statute or a rule is not, per se, a contempt of any sort. More particularly, the Cabinet insists that the minor statutory and rule violations in this case, far from demonstrating willful disobedience "beyond a reasonable doubt" (the standard applied to proof of criminal contempts), were non-issues when they, occurred but were resurrected long after the fact by the Family Court to justify punishing the Cabinet for reasons unrelated to this case.

Was the trial court the abused, as it and the Court of Appeals' majority believed, or was it the abuser, as the Cabinet maintains? If nothing else, this case illustrates how a court's power to avoid the former role creates the potential for it to occupy the latter. Our analysis begins, therefore, with a brief consideration of how the law has attempted to address that very real tension.

## *ANALYSIS*

## I. Constitutional Protections Apply To Most Criminal Contempt Proceedings.

As the Cabinet notes, this Court has characterized contempt as " 'the willful disobedience toward, or open disrespect for, the rules or orders of a court.' " *Poindexter v. Commonwealth,* 389 S.W.3d 112, 117

---

15. The Cabinet provides no authority for this assertion, but the claim is certainly plausible. *See, e.g.,* 42 U.S.C. § 671(a)(15)(C) ("In order for a state to be eligible for payments under this Part [Part E of Title 42, Chapter 7, Subchapter IV, Federal Payments for Foster Care and Adoption Assistance], it shall have a plan approved by the Secretary which ... provides that ... reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan (including, if appropriate, through an interstate placement), and to complete whatever steps are necessary to finalize the permanent placement of the child.").

16. Under KRS 22A.020, the Court of Appeals has jurisdiction over appeals from the family court even when the family court decision addresses a matter otherwise within the jurisdiction of the district court.

(Ky.2012) (quoting *Commonwealth v. Burge*, 947 S.W.2d 805, 808 (Ky.1995)). A court's authority to sanction contempt, to insist upon respect for its processes and compliance with its rulings and judgments, has long been thought necessary to, and therefore implicit in, the judicial function— the case-deciding, law-interpreting role of courts in our tri-partite form of government. *Norton v. Commonwealth*, 37 S.W.3d 750, 754 (Ky.2001) (citing *Arnett v. Meade*, 462 S.W.2d 940 (Ky.1971)). "The power of courts to punish for contempts," the United States Supreme Court has said, "is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law." *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 795 n.7, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987) (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911)).

■ That general power to sanction contempt comprises both civil and criminal aspects, an act of contempt often striking at the interest of an opposing party as well as at the authority of the court. *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (discussing the sometimes elusive distinction between civil and criminal contempt sanctions). Generally, sanctions imposed to benefit an adverse party-coercive sanctions, for example, or compensatory ones— are deemed civil and are sought and imposed through civil proceedings between the original parties, very often as part of the underlying cause. *See United States v. Rylander*, 460 U.S. 752, 103 S.Ct. 1548,

75 L.Ed.2d 521 (1983) (upholding, in case involving alleged civil contempt, a procedure whereby alleged contemnor bore burden of producing evidence that compliance with court's order to produce corporate records was impossible); *Commonwealth v. Ivy*, 353 S.W.3d 324 (Ky.2011) (noting the civil/criminal distinction and discussing the burden-shifting "show cause" procedure [17] frequently appropriate in the civil case); *White v. Sullivan*, 262 Ark. 329, 557 S.W.2d 385 (Ky.App.1983) (upholding compensatory fine as consonant with Kentucky's contempt law); *Clay v. Winn*, 434 S.W.2d 550 (Ky.1958) (involving coercive imprisonment as a sanction for failure to comply with a child-support order). *See also* Kentucky Rule of Civil Procedure (CR) 45.05 and CR 55.05 (providing, respectively, for contempt proceedings within the pending action for disobedience of a subpoena or noncompliance with an injunction).

■ Punitive sanctions, however—unconditional sanctions not subject to purgation through compliance with an order and imposed principally if not purely to vindicate the authority of the court—are deemed criminal. Criminal contempts, the United States Supreme Court has held, are "'crime[s]' in the ordinary sense,'" *Young*, 481 U.S. at 799, 107 S.Ct. 2124 (quoting *Bloom v. Illinois*, 391 U.S. 194, 201, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)), and they implicate, accordingly, the full panoply of procedural protections applicable to the states under the federal Constitution. *Hicks v. Feiock*, 485 U.S. 624, 632, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988) ("[C]riminal penalties [for contempt] may not be imposed on someone who has not

---

17. The phrase "show cause" is not defined in our rules, of course, but it has long been employed to denote an order, usually summary, providing notice of a hearing. The kind of hearing, its form and procedural requisites, will depend on the questions to be addressed and is not determined merely by the "show cause" label. *Wilcher v. Wilcher*, 566 S.W.2d 173 (Ky.App.1978).

been afforded the protections that the Constitution requires of such criminal proceedings."). What the Constitution requires, of course, is not a single, monolithic process imposed on every case. It requires, rather, the process that is "due," and in the contempt area, the Court has explained, it has arrived at the process due in different types of cases by "attempt[ing] to balance the competing concerns of necessity [the court's need for orderly processes and effective rulings] and potential arbitrariness [the risk the contempt power poses of fusing in the judge legislative, executive, and judicial powers]." *United Mine Workers v. Bagwell,* 512 U.S. at 832, 114 S.Ct. 2552. This balancing "allow[s] a relatively unencumbered contempt power when its exercise is most essential, and require[s] progressively greater procedural protections when other considerations come into play." *Id.*

■ For example, "[t]he necessity justification for the contempt authority is at its pinnacle ... where contumacious conduct threatens a court's immediate ability to conduct its proceedings, such as where a witness refuses to testify, or a party disrupts the court." *Id.* Petty contempts such as those committed directly in the presence of the court "traditionally have been subject to summary adjudication.... In light of the court's substantial interest in rapidly coercing compliance and restoring order, and because the contempt's occurrence before the court reduces the need for extensive factfinding and the likelihood of an erroneous deprivation, summary proceedings have been tolerated." *Id.* (citations omitted).

■ Summary proceedings may not be adequate, however, even with respect to some direct contempts. "If a court delays punishing a direct contempt until the completion of trial, for example, due process requires that the contemnor's rights to

notice and hearing be respected." *Bagwell,* 512 U.S. at 832, 114 S.Ct. 2552 (citing *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974)). Direct contempts, moreover, "cannot be punished with serious criminal penalties absent the full protections of a criminal jury trial." 512 U.S. at 833, 114 S.Ct. 2552 (citing *Bloom v. Illinois,* 391 U.S. at 210, 88 S.Ct. 1477). For indirect contempts—contempts, that is, occurring out of court, or contempts that are not immediately apparent to the court, but that require to be known "the confession of the party or the testimony of others," *Bloom,* 391 U.S. at 198 n. 2, 88 S.Ct. 1477—"[s]till further procedural protections are afforded." *Bagwell,* 512 U.S. at 832, 114 S.Ct. 2552. "Summary adjudication of indirect contempts is prohibited," the Court has declared, "and criminal contempt sanctions are entitled to full criminal process." *Id.* (citing *Hicks,* 485 U.S. at 632, 108 S.Ct. 1423).

That those accused of indirect or serious direct criminal contempts are entitled to "full criminal process" does not mean, the United States Supreme Court has explained, that "any prosecution of contempt must now be considered an execution of the criminal law in which only the Executive Branch may engage." *Young,* 481 U.S. at 799–800, 107 S.Ct. 2124. On the contrary, lest the judicial power be reduced to " 'a mere mockery,' " it has long been deemed essential that the Judiciary have "a means to vindicate its own authority without complete dependence on other Branches." *Young,* 481 U.S. at 796, 107 S.Ct. 2124 (quoting *Gompers,* 221 U.S. at 450, 31 S.Ct. 492). Contempt proceedings are that means, and accordingly, "[c]ourts cannot be at the mercy of another Branch in deciding whether such proceedings should be initiated." *Id.*

The power to initiate a contempt proceeding, the Court has further explained, "has of necessity encompassed the authority to appoint an attorney to prosecute such a matter." *Young,* 481 U.S. at 795 n. 7, 107 S.Ct. 2124. In the federal courts, that authority is reflected in Rule 42 of the Federal Rules of Criminal Procedure, which provides in part that a criminal contempt proceeding may be initiated by an order to show cause or an order of arrest, and that the court "must request that the contempt be prosecuted by an attorney for the government, unless the interest of justice requires the appointment of another attorney. If the government declines the request, the court must appoint another attorney to prosecute the contempt." Fed. Rule Crim. Pro. 42(a)(*l* )-(2). *Young,* 481 U.S. at 793–814, 107 S.Ct. 2124 (discussing a prior version of Rule 42 and holding that only disinterested attorneys may be appointed to prosecute contempts and only after the regular prosecutor has declined a request to do so).

Our Rules of Criminal Procedure do not include an equivalent of the federal rule or provide otherwise for criminal contempt procedures. Our practice, rather, as this case illustrates, remains more informal and is not unlike that of the federal courts a century ago when the United States Supreme Court attempted, in *Gompers v. Buck's Stove & Range Co,* 221 U.S. at 418, 31 S.Ct. 492, to delineate some of the differences between civil and criminal contempt proceedings. The Court held in that case that what had been essentially a civil proceeding (a show-cause proceeding, within the underlying suit, to address allegations by the plaintiff in the underlying suit that the defendants had violated an injunction) did not provide adequate procedural protections for the essentially criminal penalties (unconditional jail sentences) the trial court imposed.

Among the civil/criminal differences noted by the *Gompers* Court were the following: Punishment in the two contexts has a different character and serves different purposes. "If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court." 221 U.S. at 441, 31 S.Ct. 492. Trial rights and privileges in the two contexts may differ. "Without deciding what may be the rule in civil contempt, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt, and [he] cannot be compelled to testify against himself." 221 U.S. at 444, 31 S.Ct. 492. Another important difference is that "[p]roceedings for civil contempt are between the original parties, and are instituted and tried as a part of the main cause. But, on the other hand, proceedings at law for criminal contempt are between the public and the defendant, and are not a part of the original cause." 221 U.S. at 444–45, 31 S.Ct. 492. This difference is a substantial one, the Court explained, and should be reflected in how the case is styled.

In the first place the petition was not entitled 'United States v. Samuel Gompers et al.' or 'In re Samuel Gompers et al.,' as would have been proper, and, according to some decisions, necessary, if the proceedings had been at law for criminal contempt. This is not a mere matter of form, for manifestly every citizen, however unlearned in the law, by mere inspection of the papers in contempt proceedings ought to be able to see whether it was instituted for private litigation or for public prosecution, whether it sought to benefit the complainant or vindicate the court's authority. He should not be left in doubt as to whether relief or punishment was the

object in view. He is not only entitled to be informed of the nature of the charge against him, but to know that it is a charge, and not a suit.

221 U.S. at 446, 31 S.Ct. 492.

Yet another important distinction and an indication that the parties understood the *Gompers* action to be civil rather than criminal was the fact that "[t]he complainant made each of the defendants a witness for the company, and, as such, each was required to testify against himself,—a thing that most likely would not have been done or suffered if either party had regarded this as a proceeding at law for criminal contempt, because the provision of the Constitution that 'no person shall be compelled in any criminal case to be a witness against himself' is applicable not only to crimes, but also to quasi-criminal and penal proceedings." 221 U.S. at 447–48, 31 S.Ct. 492.

In *Gompers*, with respect to all of these factors (and others) the parties' practice suggested an understanding that the complaint was one for civil contempt. The trial court, however, having found the defendants in contempt of the injunction, rather than imposing a remedial fine—the apparently available civil remedy—imposed a criminal sanction instead—unconditional jail sentences. "There was therefore," the Supreme Court concluded,

> a departure—a variance—between the procedure adopted and the punishment imposed, when, in answer to a prayer for remedial relief, in the equity cause, the court imposed a punitive sentence appropriate only to a proceeding at law for criminal contempt. The result was as fundamentally erroneous as if in an action of 'A vs. B, for assault and battery,' the judgment entered had been that the

defendant be confined in prison for twelve months.

221 U.S. at 449, 31 S.Ct. 492.

## II. The Procedures Employed In This Contempt Case Do Not Accord With Those The United States Supreme Court Has Indicated Are Due.

The variance in this case between the procedures adopted and the penalty imposed was not as pronounced or as clear-cut as in *Gompers*, and of course merger allows us to disregard much of the former distinction between law and equity. The distinction between civil actions and criminal ones, however, remains highly significant, Gail Heriot, *An Essay on the Civil–Criminal* Distinction with Special Reference to Punitive Damages, 7 Journal of Contemporary Legal Issues 43 (1996), and because that distinction was blurred in this case, as in *Gompers*, the result here is similarly impossible to uphold. To be sure, unlike *Gompers*, where the parties apparently intended a civil contempt proceeding and adopted civil contempt procedures, the "parties" here—the Family Court as accuser and the Cabinet—seem to have understood that criminal sanctions were at stake. They opted for, however (or acquiesced in), proceedings that can only be called an amalgam, a tossed salad of direct and indirect contempt, civil contempt and criminal contempt. This procedural mishmash resulted in a judgment finding an agency of the Commonwealth, but not any of its individual agents, guilty of several "crimes" and sentencing—ordering—that agency, a subdivision of the executive branch, to transfer funds to the judicial branch. For reasons discussed below, we find those results and the procedures that gave rise to them sufficiently problematic to require that the judgment be reversed in part and vacated in part and that the matter be remanded either for complete dismissal or for partial reconsideration.

■ As noted above, traditionally and under current Supreme Court doctrine a court may proceed summarily to sanction petty contempts committed directly in the court's presence. *Bagwell,* 512 U.S. at 832, 114 S.Ct. 2552. Such on-the-record contempts are "self-proving," as it were, and thus do not require the court to assume a prosecutorial role in identifying or establishing them. The court's sanctioning response is a judicial act, and it is an act so naturally to be anticipated that the direct contemnor may be presumed to have notice of it. Where the conduct giving rise to the sanction occurs directly on the record, moreover, that record, even without benefit of formal hearing and adversarial briefing, will generally provide an adequate basis for appellate review of what is aptly characterized, as the Court of Appeals' majority put it, as the trial court's "nearly unlimited discretion" in exercising its contempt powers to assure the orderliness and decorum of its proceedings.

As also noted above, however, as the alleged contempt becomes more serious or less direct, the United States Constitution's Due Process Clauses require criminal contempt procedures less summary than those allowed for petty, direct contempts and more in accord with the procedural safeguards constitutionally guaranteed for ordinary criminal trials. *Bagwell,* 512 U.S. at 832–33, 114 S.Ct. 2552. In Kentucky, our courts appear largely to have relied on the show-cause hearing to provide suspected contemnors, whether civil or criminal, with notice and an opportunity to be heard. In civil cases, that process is usually initiated by the adverse party within the underlying suit, and it is that party's burden, at the show-cause hearing, to establish a prima facie contempt. If the complainant meets its burden, the burden then shifts to the alleged contemnor to offer proof in defense or in mitigation.

It appears that allegations of criminal contempt are regularly advanced in a similar way, although in criminal cases the show-cause order is apt to be issued on the court's own motion rather than at the behest of an adverse party, and the prima facie case is often inferred, as it were, from facts apparent on the face of the record. In *Poindexter v. Commonwealth,* 389 S.W.3d at 112, for example, an attorney's failure to appear at his client's arraignment prompted the arraigning court to issue a criminal summons for the attorney to show cause why he should not be held in contempt.

Even when the alleged contempt occurred off the record and not directly before the trial court, a court-initiated show-cause proceeding appears to be a (and likely the) common vehicle for addressing contempt allegations. For example, in *Riley v. Gibson,* 338 S.W.3d 230 (Ky.2011), the trial court responded to allegations by two jurors that a third juror violated the court's admonition not to seek out media coverage of the trial by, on its own motion, subpoenaing the three jurors to appear at a "contempt of court" hearing. In this case, too, as noted, the Family Court was proceeding on its own motion, not the motion of another party, when it ordered the Cabinet to appear at a hearing where, the Order advises, the Cabinet was to "present sufficient evidence to this Court as to why CHFS should not be held in contempt."

Where a petty contemptuous act was committed directly before the court and is clearly reflected in court records, such as the attorney's failure to appear in *Poindexter,* there is little objection, perhaps, to an informal show cause proceeding at which the alleged contemnor is given an opportunity to be heard in his or her defense. Notice and the opportunity to be heard, the Supreme Court indicated in

*Bagwell,* are sufficient in such cases to satisfy the demands of due process. 512 U.S. at 832, 114 S.Ct. 2552.

If the contempt was not apparent to the court when it occurred, however, either because it occurred outside the court's presence or because the in-court conduct was ambiguous, the standard show-cause proceeding becomes harder to square with what the Supreme Court has said the federal constitution requires. See *Riley,* 338 S.W.3d at 237 (noting that criminal proceedings for indirect contempts "must comport with due process."). In that case, where the alleged contempt does not appear plainly on the record but must be proved, the ordinary judge-conducted show-cause proceeding creates a number of difficulties well illustrated by the present case. For one thing, as the Family Court itself remarked, if the contempt must be proved, the court is apt to find itself in the awkward position of playing dual roles, as both prosecutor and judge. Aside from the obvious impropriety of being judge in one's own case, such a dual role is very apt to be improper for other reasons as well. Here, for example, when the court's ire and suspicions were aroused at the September 9, 2012 status conference (at which time the Cabinet's attorney failed to appear and there were indications

that the Cabinet had misrepresented its intentions with respect to seeking a termination of parental rights), the court proceeded, later that day, to hold what was in essence a discovery proceeding. The court interrogated the Cabinet's attorney, its case worker, and its court liaison, at one point demanding that the case worker call her office to find out who from that office was in court the day the judge scheduled the September 9 status conference and ordered that the Cabinet's attorney be present. The court's subsequent use of information gleaned during that interrogation to support both the Order to show cause and, ultimately, the criminal contempt rulings raises a host of difficult questions implicating not only the criminal discovery rules, but the Fifth Amendment and the presumption of innocence as well.

■■■ The Family Court's attempt to skirt some of those questions, if that is what it was, by proceeding against the Cabinet as an entity and not against any of the individuals involved (including those interrogated) only multiplies the difficulties, for it raises fundamental questions about an agency's potential for criminal liability,[18] as well as questions about the Cabinet's governmental immunity from fines.[19]

18. While it is well established that individual government officials may be held in criminal contempt for willfully violating a court order, *Commonwealth ex rel. Dep't of Nat. Res. & Envtl. Prot. v. Williams,* 536 S.W.2d 474 (Ky. 1976) (citing *Wallace v. Sowards,* 313 Ky. 360, 231 S.W.2d 10 (1950)), entity liability is not so clear. *Cf. City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (holding that municipalities are immune from liability for punitive damages under 42 U.S.C. § 1983 in part because "[a] municipality ... can have no malice independent of the malice of its officials. Damages awarded for *punitive* purposes, therefore, are not sensibly assessed against the governmental entity itself."); and see Stuart P. Green, *The Criminal Prosecution of*

*Local Government,* 72 North Carolina Law Review 1197, 1215 n. 107 (1994) (noting that *mens rea* and self-prosecution problems can call into question the criminal liability of states and state agencies as well as local governments); *Cobell v. Norton,* 334 F.3d 1128 (D.C.Cir.2003) (discussing criminal contempt alleged against federal agency).

19. *Cf. Barry v. Bowen,* 884 F.2d 442 (9th Cir.1989) (holding that compensatory contempt fines awarded against the Secretary of Health and Human Services were barred by sovereign immunity); *In re Newlin,* 29 B.R. 781, 785 (E.D.Penn.1983) (holding that sovereign immunity was implicated (and violated) by the bankruptcy court's criminal contempt

None of those questions (and undoubtedly there are others) is before us, but they darken the landscape notwithstanding. We have already remarked, moreover, on the awkwardness of the trial court proceedings, where the Family Court, in the absence of a prosecutor, found itself having to rely on advice from the Cabinet's counsel as to who was the defendant and whether the proceeding was civil or criminal. That awkwardness has continued on appeal, since without a prosecutor only the Cabinet's side of the case has been briefed. If the record were simple (and complete) and the case straightforward enough to permit us confidently to infer from the court's Order likely responses to the Cabinet's allegations of error, the lack of a responsive brief might not be much of a hindrance. As it is, however, the lack of the usual adversarial response adds much to our sense of unease, and gives us strong, additional reason to be dissatisfied with these procedures.

### III. The Family Court's Contempt Findings Appear To Be Unsupported.

However, as profound as our procedural misgivings may be (and they are grave), the Cabinet acquiesced in the Family Court's manner of proceeding and complains on appeal only about what it maintains were the Family Court's substantive errors. The Family Court, the Cabinet (and the dissenting Court of Appeals judge) insists, exceeded what might be thought of as its contempt "jurisdiction" by punishing the Cabinet for violating a statute in the absence of a court order particularizing the Cabinet's duty to obey the statute. The Cabinet makes a similar argument with respect to the court's punishing it for having violated a Family Court rule. The court further erred, according to the Cabinet, by basing all of its contempt findings on insufficient evidence that the Cabinet's rule and statutory violations were "willful." And the court abused its discretion; in the Cabinet's view, by offering up petty, immaterial transgressions by ground-level Cabinet employees as pretexts for punishing the Cabinet itself, when in fact the trial court was angry with the Cabinet for reasons (the aforementioned e-mail) unrelated to this case. Because, in what was a criminal proceeding, the trial court's order does not make clear that it correctly applied the required "beyond a reasonable doubt" standard to its findings of fact, we agree with the Cabinet that the judgment cannot stand. As explained below, rather than dismissing outright, we have decided to reverse in part, vacate in part, and remand. The remand will permit dismissal or reconsideration in light of the concerns we have mentioned.

■ The Cabinet's sufficiency-of-the-evidence and "jurisdictional" arguments are related, for the elements of contempt reflect the interests the contempt power exists to protect. Those interests, the United States Supreme Court explained in *Young* are limited:

That criminal procedure protections are now required in such prosecutions [criminal contempt prosecutions] should, not obscure the fact that these proceedings are not intended to punish conduct proscribed as harmful by the general criminal laws. Rather, they are designed to serve the limited purpose of vindicating the authority of the court. In punishing contempt, the Judiciary is sanctioning conduct that violates specific duties imposed by the court itself, arising directly

citation against a government agency (the IRS)); *United States v. Droganes,* 728 F.3d 580 (6th Cir.2013) (holding that sovereign immunity barred claim for compensatory sanctions against the government).

from the parties' participation in judicial proceedings.

481 U.S. at 800, 107 S.Ct. 2124. In accord with that limited purpose, the elements of criminal contempt are frequently said to comprise the following: (1) a lawful and reasonably specific order; (2) that was violated; (3) willfully. *See, e.g., Romero v. Drummond Co.,* 480 F.3d 1234, 1242 (11th Cir.2007); *Dalessio v. Kressler,* 6 A.D.3d 57, 773 N.Y.S.2d 434 (App.Div.2004) (willful disobedience of lawful mandate of court); *Ex parte Chambers,* 898 S.W.2d 257, 259 (Tex.1995) ("reasonably specific order; ... a violation of the order; and ... the willful intent to violate the order."). As noted above, this Court has departed somewhat from that common formulation and has described criminal contempt as "[1a] the willful [2a] disobedience toward, or [1b] open [2b] disrespect for, [3] the rules or orders of a court." *Poindexter,* 389 S.W.3d at 117. Although broader, perhaps, than the version limited to willful violations of reasonably specific court orders, we agree with the Cabinet and the dissenting Court of Appeals judge that our version of the contempt elements is likewise limited, as the Supreme Court said, to the "violat[ion of] specific duties ... arising directly from the parties' participation in judicial proceedings," not to a party's duties generally under the substantive law. *Cf. Commonwealth v. Nicely,* 326 S.W.3d 441 (Ky.2010) (holding that probationer's substantive violation can be the basis of probation revocation, but should not be punished as a contempt); *Jones v. United States,* 560 A.2d 513 (D.C.1989) (same). Such duties, for the most part, will be those "imposed by the [sanctioning] court itself," through its orders and judgments.

As *Poindexter* demonstrates, however, and as our formulation of the contempt elements makes express, there will be times when a party's violation of a rule will amount to as clear and disruptive a violation of his or her duty to the court as would the violation of a court order, and in those instances the rule violation, if shown to be willful, may be sanctioned as a contempt. *Cf. United States v. Cohn,* 586 F.3d 844 (11th Cir.2009) (upholding contempt conviction of attorney who, in violation of rules governing the admission and practice of attorneys in the Southern District of Florida, continued, after his Florida license had been revoked, to represent defendant in federal court).

The neglect and termination of parental rights actions underlying the alleged contempts in this case, moreover, are "special statutory proceedings," as that term is employed in CR 1.[20] and FCRPP 1.[21] *C.C. v. Cabinet for Health and Family Services,* 330 S.W.3d 83 (Ky.2011). As such, they are subject to statutory procedural provisions, which, like the Civil and Family Court Rules they supplement, may, in an appropriate case, be enforced through contempt proceedings. See KRS

---

20. CR 1(2) provides in part that "These Rules [The Rules of Civil Procedure] govern procedure and practice in all actions of a civil nature in the Court of Justice except for special statutory proceedings, in which the procedural requirements of the statute shall prevail over any inconsistent procedures set forth in the Rules."

21. The Family Court Rules "constitute a separate section of the civil rules." FCRPP 1(1).

FCRPP 1(2) provides in part that "[t]hese Rules [the Family Court Rules of Procedure and Practice] shall be applicable to the procedure and practice in all actions pertaining to ... neglect or abuse [and] termination of parental rights ... except for any special statutory proceedings, which shall prevail over any inconsistent procedures set forth in these Rules."

600.060 (acknowledging expressly "the inherent contempt power of the court" as applicable to proceedings arising under KRS Chapters 600 to 645). Thus, while as a general matter we agree with the Cabinet and the dissenting Court of Appeals judge that a court's contempt power is appropriately addressed not to the enforcement of statutorily created duties generally, but only to the enforcement of those specific duties arising directly from participation in the particular judicial proceeding, we do not agree that such specific duties can never arise in the absence of a court order. Where a rule or a procedural statute creates a duty clearly applicable to the instant proceeding and the obliged party violates the duty under circumstances that could reasonably be thought to show beyond a reasonable doubt that the violation was willful or openly disrespectful, then criminal contempt may well be an appropriate sanction.

We thus reject the Cabinet's contention that the Family Court's contempt findings were beyond the court's authority and erroneous as a matter of law because they were based on rule and statutory violations rather than on violations of court orders. It remains to be considered, however, whether the Family Court properly determined that the violations were sufficiently culpable to be sanctioned as contempts.

■■■■■ As noted, we have characterized the *mens rea* element of criminal contempt as "willful" disobedience or "open" disrespect. "Willfully," we elaborated in *Poindexter*, "means 'with intent or intentional[,]' ... '[v]oluntary and intentional, but not necessarily malicious.'" 389 S.W.3d at 117 (quoting *Caretenders, Inc. v. Commonwealth*, 821 S.W.2d 83, 87 (Ky. 1991) and *Black's Law Dictionary* (9th ed. 2009)).[22] *Mens rea*, of course, including willfulness or intent, may be inferred from the alleged crime's surrounding circumstances. *Sevier v. Commonwealth*, 434 S.W.3d 443, 455 n. 25 (Ky.2014) (citing *Commonwealth v. Wolford*, 4 S.W.3d 534, 539 (Ky.1999) ("Although the prosecution in a criminal case has the burden of proving every element of the defendant's guilt beyond a reasonable doubt, we have long held that *mens rea*, specifically intent, can be inferred from circumstances.")). And

22. Our Penal Code, and the Model Penal Code upon which ours is based, reduce (attempt to reduce) the plethora of common-law methods of stating the mental element of crimes to four: Intentionally (Purposefully in the Model Code); Knowingly; Wantonly (Recklessly in the Model Code); and Recklessly (Negligently in the Model Code). KRS 501.020; Model Penal Code § 2.02. The Commentary to the Kentucky Penal Code considers this reduction so fundamental a departure from existing law that it recommends applying the new definitions "without reference to existing ones." Kentucky Penal Code, Final Draft, Sec. 205, commentary p. 17 (November 1971). There is thus no discussion of "willfulness" in the Code's commentary. That term still occurs outside the Penal Code, however, as, for example, in the Uniform Residential Landlord and Tenant Act (KRS 383.500—383.705), where it is defined as "with deliberate intention, not accidentally or inadvertently, and done according to a purpose." KRS 383.545(17). The Model Penal Code takes a slightly different tack. It provides that "[a] requirement that an offense be committed wilfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears." Model Penal Code § 2.02(8). In an explanatory note, the drafters state that "[t]hough the term "wilfully" is not used in the definitions of crimes contained in the Code, its currency and its existence in offenses outside the criminal code suggest the desirability of clarification. It is unusually ambiguous standing alone." The Model Penal Code and its Commentaries, Part I, p. 228 (The American Law Institute 1985). Of course, the distinction between knowing and intending can be vanishingly slight, but in this case it makes a difference.

courts have held that "willfulness," as an element of contempt, may often be· inferred from a knowing·failure to comply with a ·court order, *Dalessio v. Kressler*, 773 N.Y.S.2d at 440, or, in the case of attorneys, from conduct that "discloses a reckless [what we would call wanton] disregard for his [or her] professional duty." *In re Farquhar*, 492 F.2d 561, 564 (D.C.Cir.1973). A knowing violation is necessary, to be sure (hence the requirement that·the order or other source of the contemnor's duty be reasonably clear and specific). *Commonwealth v. Pace*, 15 S.W.3d 393 (Ky.App.2000) (attorney's merely negligent failure to appear at sentencing· hearing did not support finding of criminal contempt). But a knowing violation·will not always be sufficient.

We have construed "willful" in the contempt context to mean not merely knowing but intentional, and the difference is along the lines of a conscious purpose to disobey the authority of the court. The disobedience may be reluctant, polite, and regretful, as it appears to have been in *Poindexter* ("[T]here need not be a showing of malice or disrespect in order for a trial court to·hold an attorney in criminal contempt." 389 S.W.3d at 118), or it may be openly defiant, as it was in *Norton v. Commonwealth*, 37 S.W.3d 750, 754 (Ky. 2001) (After being found guilty, "[a]ppellant erupted in what he now modestly describes as·an 'emotional outburst.'"), but to be contemptuous the violation of a duty must involve a duty the court meant to enforce. Courts, of course, frequently waive compliance with procedural rules (*Poindexter*, 389 S.W.3d at 118, Noble, Justice, dissenting), and while that may or may not be appropriate depending on the circumstances, the rule violation in that situation is not disobedient and so should not give rise to a charge of criminal contempt.

## A. There Was Insufficient Evidence of a "Willful" Violation of The Family Court Rules.

 By the trial court's own admission, that is what happened in this case. with respect to the violation of FCRPP 34. As noted, that rule requires that "[i]mmediately upon the filing of any petition for involuntary .termination of parental rights, the petitioner shall obtain a pretrial date." The Cabinet admits that in March ·2012 when its attorney filed the TPR petitions in these cases he did· not obtain pretrial dates. According to the Cabinet, however, at least in Fayette .County, none of its attorneys filing TPR petitions had ever immediately·obtained a pretrial date. Apparently, the entire Fayette County Family Court bench routinely waives compliance with the rule. At the "discovery" conference during the afternoon of September 9, 2012 in this case, the Family Court acknowledged that practice and stated that it had not required compliance with Rule 34 because it had "felt sorry for the Cabinet" and wanted "to give the Cabinet a break." But, the court continued, "it looks like we're going to have to start . doing that. We're going to have to start finding time for the attorneys that ·file these TPR's to have a pretrial conference to make sure we're on track." Here is an instance, then, where knowing noncompliance with a rule was not only *not* contempt per se, as the trial court and the Court of Appeals majority believed, but does not support an inference of ·contempt either, because no reasonable fact finder could conclude from the record (such as it is), much less conclude beyond a reasonable doubt, that the attorney intended to disobey the court. We agree with the Cabinet, therefore, that the two contempt convictions premised upon the Cabinet's attorney's non-compliance with FCRPP 34 were not supported by sufficient evidence of

willfulness, and so must be reversed and the criminal charges dismissed. *See Bagwell,* 512 U.S. at 826, 114 S.Ct. 2552 (citing *In re Bradley,* 318 U.S. 50, 63 S.Ct. 470, 87 L.Ed. 608 (1943) for the proposition that constitutional protections against double jeopardy apply to criminal contempt proceedings).

**B. Whether The Alleged Statutory Violation Was "Willful" Cannot Be Determined From The Record As Provided.**

The Family Court also found the Cabinet in contempt for its social workers' failure, in both cases (Janie's and Charles's), to file the initial case progress report as required by KRS 620.240. Again, the Cabinet concedes that the case workers did not comply, or at least did not fully comply with the statute, but it contends that the court's contempt Finding was erroneous because there was no evidence that the case workers' omissions, if any, were willful. Unfortunately, our review of this issue is hampered by the trial court's having assumed but only partially fulfilled the role of prosecutor. As a result, we cannot be sure what precisely the trial court meant to charge. In this predicament, rather than simply reversing the contempt findings, we believe the better approach is to vacate the Family Court's Order with respect to the alleged contempts by the social workers and to remand for additional proceedings if the court determines that additional proceedings are still warranted, in light of the point already made that a violation of the statute is not, per se, a contempt.

KRS 620.240 provides in pertinent part that

> The cabinet shall file for each child a case progress report at least once every six (6) months with the court and the Administrative Office of the Courts Citizen Foster Care Review Board Program. The first case progress report

after the child is placed in the custody of the cabinet by an order of temporary custody or commitment shall be mailed to the Administrative Office of the Courts Citizen Foster Care Review Board Program and subsequent case progress reports shall be provided to the local citizen foster care review board within the case file.

As noted in the fact section of this Opinion, this statute must be read in conjunction with KRS 620.230 and KRS 610.125. The former requires the Cabinet, for each child placed in its custody by an order of commitment, to

> file a case permanency plan for the child with the court and send a copy to the Administrative Office of the Courts Citizen Foster Care Review Board Program as soon as the plan is prepared but no later than thirty (30) days after the effective date of the order.

In pertinent part, KRS 610.125 requires the court, if a child has been removed from his or her home and placed in the custody of the Cabinet, to

> conduct a permanency hearing no later than twelve (12) months after the date the child is considered to have entered foster care, and every twelve (12) months thereafter if custody and out-of-home placement continues, to determine the future status of the child.

KRS 610.125(1). The upshot of the permanency hearing is meant to be "a written order determining the permanency plan for the child," KRS 610.125(6).

In addition to incorporating the General Assembly's statements of purpose in KRS 600.010 and KRS 620.010—the fundamental purpose being to protect children, preferably by maintaining and strengthening the biological family unit, but if necessary by pursuing alternatives to that family unit—all of these statutes include similar

lists of factors the court and the Cabinet are to consider in arriving at and. implementing permanency plans for children removed from their parents on the grounds of dependency, neglect, or abuse. In conjunction, the statutes provide for a prompt initial assessment by the Cabinet of .the family's needs and the goals for the child; regular Cabinet assessments of progress toward those goals and reassessment of the goals themselves; and at least annual judicial review of Cabinet case plans with authority in the court to override the Cabinet's recommendations.

While this general outline is clear enough, the statutes are highly redundant so that distinctions between "progress reports" and "permanency plans" tend to blur along the margins, with the result that the finer details of the Cabinet's reporting duties are not crystal clear. Unfortunately, given this lack of clarity, neither the Family Court nor the Cabinet has explained, with adequate reference to the record, precisely how the Cabinet's social worker(s) ran afoul of KRS 620.240.

The record indicates that for statutory purposes the children "entered foster care" on July 26, 2010, the day.the court adjudicated them neglected. In conjunction with the disposition hearing, which took place on August 25, 2010, the social worker filed a "Dispositional Report." That report summarizes the children's case histories, describes their present situation and current custody status, and recommends that they be "committed to the Cabinet as neglected with a goal of Return to Parent." The report acknowledges, however, the. parents' incarcerations and so notes that "due to the significant sentence length for both parents, another goal may be appropriate for these children. This will be staffed with Office of Counsel in September to determine whether or not a goal change is appropriate." The court

incorporated that recommendation and the Cabinet's further recommendation not to provide reunification services to the father (due to his lengthier incarceration) in its August 25, 2010 dispositional order, but as noted above, in response to concerns expressed by the children's GAL that the permanency plan should provide at least contingently for an adoption alternative, the court scheduled a reconsideration of the matter in October. The court also noted that it would seek input from the Fayette County Interested Party Review Board.

In conjunction with what the court referred to as a "Permanency Hearing" on October 11, 2010, the social workers filed a report, styled "Review," in which they again summarized the children's case histories and described the children's "current status," noting developments since the prior report, including concerns expressed by.the foster parents. The Cabinet's permanency goal recommendation at this point had changed: "It is the position of the Cabinet that [the. children] be committed to the Cabinet as neglected with a goal of adoption." Once again, the record does not reflect any dissatisfaction by the Family Court with the Cabinet's performance, and again the court's Order following the hearing incorporates the Cabinet's recommendations—the goal change to adoption and, in light of that change, a further recommendation that reunification services also be waived with respect to the mother.

The social workers also filed a "Review Report" in early November 2010, although as no·hearing was scheduled at that time this report seems to have taken the trial court by surprise. In addition to reprising the case history, the report updates the progress of the children in the care of the foster parents, reiterates that adoption is the permanency goal, and describes a telephone conference with the parents on No-

vember 4, 2010, during which the parents were informed that the goal had been changed to adoption.[23] At that time, the parents responded by requesting that certain relatives be considered for placement. The November report is the last progress report in the record until the report filed in July 2011 in conjunction with the annual permanency hearing, which the court held on July 19, 2011.[24]

As noted, KRS 620.230 and 620.240 require the Cabinet to file an initial report and permanency recommendation within thirty days of a child's commitment to the Cabinet, and to file progress reports at least every six months thereafter. The Cabinet's "Dispositional Report" in August 2010, and its "Review" reports in October and November 2010, would appear to satisfy its statutory obligations, at least as far as reporting to the court is concerned, for the first six-month period. The court's order does not explain why the court deemed those reports inadequate, and since the Cabinet, likewise, does not clarify what constituted the alleged omission, we are left in doubt. One possibility is that in addition to requiring that an initial progress report be filed with the court, KRS 620.240 also requires that

> [t]he first case progress report after the child is placed in the custody of the cabinet by an order of temporary custody or commitment shall be mailed to the Administrative Office of the Courts Citizen Foster Care Review Board Program.

Because the court's contempt allegations focused on the Cabinet's breach of duty only with respect to its first progress re-

port, and because the show cause Order setting the contempt hearing described the alleged breach of KRS 620.240 as a failure "to file and mail the first required case Progress Report," it could be that the court deemed contemptuous the Cabinet's failure (if there was such a failure) to give the required notice to the Citizen Foster Care Review Board Program. The Order actually finding the Cabinet in contempt, however, makes no reference to the mailing requirement, which removes any temptation to speculate. We prefer, rather, simply to vacate the Family Court's Order to the extent that it found the Cabinet in contempt for violating its duties under KRS 620.240 and to remand that portion of the matter so that the court may, if it still wishes to proceed, clarify how, in its view, the Cabinet violated the statute, and how the violation amounted to willful disobedience of the court. In the event of additional proceedings, procedural concerns such as those we have identified (including double jeopardy), the scope of Cabinet criminal liability for the acts of its employees, and sovereign immunity would all be in play.

## IV. The Court Of Appeals Applied An Unduly Deferential Standard Of Review.

Finally, as noted the Cabinet also challenges the Family Court's contempt rulings as pretextual—and hence abuses of discretion—because of comments the court made in the course of the proceedings suggesting that the court was frustrated by Cabinet practices having nothing to do with this particular case. That frustration, the Cabinet contends, not the inconsequen-

---

23. The Court of Appeals has held that such a goal change implicates the parents' due process rights. *R.V. v. Commonwealth*, 242 S.W.3d 669 (Ky.App.2007).

24. The more-than-six-month hiatus in progress reports appears, at least arguably, to be a breach of the Cabinet's reporting duties, but this hiatus, which does not pertain to the initial report, does not appear to be the focus of the trial court's concern.

624

tial violations the Family Court dredged up from the record, was the real reason for the punishment meted out here. Since we have granted the Cabinet relief for other reasons and have already expressed our concerns regarding the imposition of criminal liability and monetary fines on the agency for the acts of its agents, we need not attempt to address the merits of this contention. We take the opportunity, however, to refer once again to the Supreme Court's warning in *Bagwell*, that while the authority to respond to contempts is essential to the efficacy and independence of the judicial branch, "the contempt power also uniquely is 'liable to abuse.'" *Bagwell*, 512 U.S. at 831, 114 S.Ct. 2552 (quoting *Bloom*, 391 U.S. at 202, 88 S.Ct. 1477). "That one and the same person should be able to make the rule, to adjudicate its violation, and to assess its penalty is out of accord with our usual notions of fairness and separation of powers." 512 U.S. at 840, 114 S.Ct. 2552 (Scalia, Justice, concurring).

■ These concerns, we are persuaded, make inappropriate the one-size-fits-all standard of review employed in this case by the Court of Appeals. That Court's majority Opinion characterizes the trial court's exercise of its contempt power as a matter of "nearly unlimited discretion." As we have seen, however, the contempt power applies to a broad range of disruptive and disobedient conduct, from the pettiest of courtroom antics to the deliberate undermining of the court's substantive orders. It also applies both civilly and criminally, authorizing the court to impose even serious criminal penalties, including lengthy incarcerations and heavy fines. While it may well be appropriate to recognize a court's very broad discretion to respond as needed to the petty sort of direct contempts that threaten the orderliness and decorum of the court's proceed-

ings, it is a different matter entirely to say that a court can impose substantial criminal penalties for indirect contempts, with all the stigma and other collateral consequences attending such penalties, without being subject to the ordinary criminal-judgment standards of review. If the constitutional rights the Supreme Court has held are applicable to criminal contempt proceedings are to provide the protection they are meant to provide, then appellate review of their application in such proceedings must be more searching than the highly deferential standard of review adopted by the Court of Appeals in this case. Appellate review of criminal contempt sanctions should be commensurate with the review provided in regular criminal cases of a comparable seriousness, as suggested by the penalties imposed.

### CONCLUSION

In sum, while courts must have, and do have, the authority to insure by way of contempt sanctions the orderliness of their proceedings and the effectiveness of their rulings, that authority is no less subject to the constraints of due process than is the authority of the state to insure by way of criminal convictions the orderliness of the public streets. In particular, unless imposed for petty contempts committed directly in the presence of the court, criminal contempt sanctions may not be imposed absent procedures consonant with those required under the federal constitution for regular criminal trials of like import.

In our courts, contempt proceedings, civil and criminal, appear typically to follow a "show cause hearing" format, with the show cause order initiating the proceeding and providing notice, and, in the civil case, with the party that moved for the order or that would benefit from a contempt finding performing the complain-

ant's role. A complication that can arise in the criminal context, and that arose in this case, stems from the fact that, technically at least, criminal contempt is a wrong against the state—the court—not the opposing party. Since courts lack prosecutorial arms, of course, it is not altogether clear how criminal contempt charges ought to be tried. Unlike the Federal Rules of Criminal Procedure, which, with Fed. R.Crim. Pro. 42, address that problem, our rules do not, leaving our courts in the bind, seemingly, of having to prosecute criminal contempts themselves. If the contempt was not too serious and occurred directly before the court or nearly so, as in *Poindexter*, the bind may not pinch too severely, since in that case to meet the initial prosecutorial burden the court can appeal to the record that already exists, rather than having to create one, and so need not engage in "prosecuting" so much as in "judging" in the ordinary way.

If the alleged contempt was indirect, however, as it was in this case, the court's dilemma becomes more acute. Who, in that case, creates the record upon which a judgment can be based? As it happened, after the Cabinet attorney's no-show at the September 9, 2011 status conference, an angered court quite spontaneously "solved" its dilemma in this case by conducting a sort of informal inquiry proceeding at which it asked Cabinet employees (unadvised and unsworn) a host of potentially incriminating questions, and then treated that proceeding as part of the "record" from which "direct" contempt could be discerned.[25] The Cabinet did not object to any of this, so this case does not require us to rule on these matters, but we hope

that our discussion will at least alert the bench and bar of the need to become more mindful of criminal contempt's constitutional ramifications.

The Cabinet did object to being found in contempt on the basis of insufficient evidence, and that objection, we are convinced, is sound. The Family Court held, in essence, that the Cabinet's breach by omission of two procedural rules (one a special statutory procedure) could be deemed, without more, contempts because they showed a sort of generalized disrespect for the law of the land. That holding misconceives the purpose of the court's contempt power. That power does not convert the court into a sort of generalized rule enforcement agency. It authorizes, rather, a court to insist upon respect for its own rulings and proceedings, which means that the power ought not be invoked absent sufficient evidence that the invoking court is itself in some way being willfully disrupted or disobeyed.

Under that standard, it was clearly erroneous for the Family Court to hold the Cabinet in contempt for disregarding a rule—the rule requiring a prehearing conference request to accompany the filing of a TPR petition—the court itself acknowledged regularly disregarding. The Family Court also appears to have erred by finding contemptuous the case workers' failure to file a statutorily required report in the absence of evidence that the failure constituted willful disobedience. As noted, the basis of the court's latter ruling is not clear from its Order, and the ruling has not been supported by appellate briefing, so out of an abundance of caution, we

---

**25.** Of course, the need for such questioning to reveal the contempt is precisely what makes the contempt indirect. *See In re Smothers,* 322 F.3d 438, 440 (6th Cir.2003) (noting that omissions—an attorney's failure to appear, say, or his or her failure to file a report or a

motion as alleged in this case—will seldom constitute a direct contempt because the reason for the omission is material to the willfulness element of the crime, but, generally, "the reason ... is not something obvious to the court.").

vacate rather than reverse that ruling and remand to give the Family Court an opportunity, if it thinks the matter important to pursue, to explain more clearly than heretofore precisely how it believes the Cabinet violated the statute and why that violation should be deemed willful disobedience of the court.

While we agree, thus, with the Cabinet that the trial court went astray attempting to apply its contempt authority in this case, that does not mean we fail to perceive why the court felt driven to the attempt. Lest the lack of a brief in support of the Family Court's Order result in a misleadingly one-sided Opinion, it behooves us to include in this summary an acknowledgement of the Family Court's decision not to hold the Cabinet or its case handlers in contempt for what could readily be perceived as a deliberate flouting of the court's October 2010 permanency-plan Order, the Order calling for these children to be readied for adoption. Although the Cabinet paid lip service to that Order, the record can most assuredly be thought to show that in fact for more than a year the case handlers simply disregarded it in favor of their own agenda, which was to wait out the parents' incarcerations and reunify the family upon their release. Particularly in light of the GAL's silence in the face of this apparent thwarting of his request for adoption preparations, we simply note, without intending any comment upon it, the power struggle between court and Cabinet, a struggle likely to recur as long as there are competing views concerning how best to protect at-risk children. Mary Kay Kisthardt, *Working in the Best Interest of Children: Facilitating the Collaboration of Lawyers and Social Workers in Abuse and Neglect Cases,* 30 Rutgers Law Record 1 (Spring 2006); Sally Day, *Mothers in Prison: How the Adoption and Safe Families Act of 1997 Threatens Parental Rights,* 20 Wisconsin Women's Law Journal 217 (Fall 2005); *Aggravated Circumstances, supra.* We note that, in this case at any rate, the trial court had ample justification for finding that the Cabinet's foot dragging amounted to at least a lack of due diligence and a failure to make reasonable efforts to finalize the permanency plan for these children.

In sum, the trial court's criminal contempt findings for rule and statutory violations, respectively, either are not supported or do not appear to be supported by the record. Accordingly, we reverse the Opinion of the Court of Appeals and remand the matter to the Fayette Family Court for additional proceedings, if necessary, consistent with this Opinion.

Minton, C.J.; Cunningham, Keller, Noble, and Venters, JJ., sitting. All concur. Wright, J., not sitting.