RENDERED: APRIL 28, 2022
TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0180-DGE

COMMONWEALTH OF KENTUCKY,                                              APPELLANT
CABINET FOR HEALTH AND FAMILY
SERVICES


                              ON REVIEW FROM COURT OF APPEALS
V.          NOS. 2020-CA-1336, 2020-CA-1342 AND 2020-CA-1343
                              BULLITT CIRCUIT COURT NOS.
            20-J-00145, 20-J-00145-003, 20-J-00146, 20-J-00146-003,
                        20-J-00147 AND 20-J-00147-003



TAMMY BAKER; BULLITT COUNTY                                           APPELLEES
ATTORNEY'S OFFICE; K.T.,
DAUGHTER; K.T., FATHER;
K.T., SON 1; K.T., SON 2; AND
M.H., MOTHER


**OPINION OF THE COURT BY JUSTICE HUGHES**

**<u>VACATING AND REMANDING</u>**

This Court granted the Cabinet for Health and Family Services' (CHFS or

Cabinet) motion for discretionary review to determine whether it is

governmentally immune from the dependency/neglect/abuse (DNA) actions

brought against it by a guardian ad litem (GAL). The Court of Appeals affirmed

the Bullitt County Family Court's conclusion that the Cabinet is not

governmentally immune from DNA actions, but aptly noted that a DNA petition

against the Cabinet is "unusual." Indeed, a separate petition in the

circumstances of this case was not simply unusual but totally unwarranted.

The GAL's concerns and allegations regarding the Cabinet's conduct with respect to three children committed to its temporary custody should have been addressed by motion in the context of the existing DNA cases not in separate actions that have evolved into unnecessary, time-consuming disputes about the Cabinet's claimed governmental immunity. Aside from the total absence of any legal justification for the GAL's three new DNA petitions, the petitions were moot on their face at the time they were filed because the safe return of the children from Florida where their parents had taken them had already been accomplished and any shortcomings on the Cabinet's part could be addressed in the pending DNA actions. Simply put, the three petitions filed by the GAL should have been dismissed. Accordingly, we vacate the lower courts' decisions and remand for dismissal of the GAL's DNA petitions.

**FACTUAL AND PROCEDURAL BACKGROUND**

On June 9, 2020, the CHFS filed petitions in the Bullitt County Family Court alleging, collectively, that three siblings, two-year-old twins and a one-year-old child, whose natural father is K.T. (father) and natural mother is M.H. (mother), were being abused or neglected by their mother. The grounds for the petition in each child's case follow:

> CHFS received JC3[1] regarding incident where [mother] left [three of her children, a five-year old and the two-year-old twins] unattended in the car while she went into [a department store] to reportedly use the bathroom. [Mother took the one-year-old child with her.] Mother was charged with three counts of wanton

---

[1] The JC-3 form is provided by the Justice and Public Safety Cabinet for a law enforcement officer's use when responding to a report of domestic violence and abuse or dating violence and abuse. Kentucky Revised Statute (KRS) 209A.120(2).

endangerment via law enforcement citation and one count of possession of marijuana via citation. CHFS already had an active ongoing case with this family due to an incident[2] of supervision neglect . . . . CHFS has made referral for KVC in-home services to assist [mother] in learning appropriate supervision of the children as well as to help further parenting skills. First Steps referral has also been made on behalf of the child. CHFS also will be making 3 C's childcare referral to assist the family with daycare services reopening as COVID-19 restrictions reduce. CHFS is requesting this case remain a non-removal, however would like court involvement to assist in monitoring the family.[3]

Although "requesting non-removal," the CHFS social worker also completed the Emergency Custody Order Affidavit section of the AOC-DNA-1 form which allows the CHFS worker to provide additional facts which support a

---

[2] The Cabinet's brief does not give the details of the previous neglect case, but the CASA volunteer's report filed in the record July 15, 2020 provides the following information:

> The [mother] stated that the reason she had a previous case with the Cabinet was because the teachers at [her daughter's] school put her on the bus to come home instead of straight to daycare as she always went straight to daycare after school. The neighbor got her off the bus and called CPS. [The mother] was working at McDonald's and just couldn't get to her daughter in a very timely manner. Case was closed as it was a non-issue.

The CASA report states the daughter is eight years old.

[3] KRS 620.130(1) states:

In any proceeding under this chapter, when the court is petitioned to remove or continue the removal of a child from the custody of his parent or other person exercising custodial control or supervision, the court shall first consider whether the child may be reasonably protected against the alleged dependency, neglect or abuse, by alternatives less restrictive than removal. Such alternatives may include, but shall not be limited to, the provision of medical, educational, psychiatric, psychological, social work, counseling, day care, or homemaking services with monitoring wherever necessary by the cabinet or other appropriate agency. Where the court specifically finds that such alternatives are adequate to reasonably protect the child against the alleged dependency, neglect or abuse, the court shall not order the removal or continued removal of the child.

3

child's removal from the home as the least restrictive placement at that time.

The CHFS worker stated: "3 children ages 5, 2, & 2 left alone in motor vehicle temperature approx 81° F." The CHFS worker cited these additional facts as the immediate risk to each child which justified entry of an ex parte order.[4]

The Family Court entered an order the same day removing the children from their mother's custody and placing them in the emergency custody of the CHFS. The temporary removal hearing was held June 11, 2020.[5] The father of

---

[4] KRS 620.060(1) provides:

The court for the county where the child ordinarily resides or will reside or the county where the child is present may issue an ex parte emergency custody order when it appears to the court that removal is in the best interest of the child and that there are reasonable grounds to believe, as supported by affidavit or by recorded sworn testimony, that one (1) or more of the following conditions exist and that the parents or other person exercising custodial control or supervision are unable or unwilling to protect the child:

(a) The child is in danger of imminent death or serious physical injury or is being sexually abused;

(b) The parent has repeatedly inflicted or allowed to be inflicted by other than accidental means physical injury or emotional injury. This condition shall not include reasonable and ordinary discipline recognized in the community where the child lives, as long as reasonable and ordinary discipline does not result in abuse or neglect as defined in KRS 600.020(1); or

(c) The child is in immediate danger due to the parent's failure or refusal to provide for the safety or needs of the child.

The Family Court found that there were reasonable grounds to believe all three conditions existed.

[5] By the time of this hearing the three children had been placed with a paternal aunt.

the children was not present at the hearing.[6] The mother, through counsel, agreed to the CHFS's temporary custody of the children and the continued placement with their paternal aunt. Adjudication was scheduled for July 16, 2020.

In the meantime, on June 30, 2020, the CHFS Social Services Clinician (clinician) learned from the Social Service Specialist, who was completing a formal home evaluation of the paternal aunt's home, that the children were with their father. More specifically, on July 1, 2020, the clinician learned that the father had taken the children from the paternal aunt's house to his new residence in Florida. The children's mother went with them.[7] Bullitt County Department for Community Based Services did not approve of the aunt releasing the children into the father's care although once the father learned that the children were in the state's care and contacted the Cabinet, it was understood that the father would be assisting with the children while they were in his sister's care.

Five days later, on July 6, 2020, the clinician communicated the status of the children to Family Court staff[8] and distributed the email to others, including the children's GAL, Tammy Baker. The email indicated that the prior

---

[6] The father's notice was sent to a Louisville, Kentucky address. As discussed below, the father was residing in Florida.

[7] Prior to this, the Court-Appointed Special Advocate (CASA) had informed the mother that the court's permission was required to take the children to Florida.

[8] The email is an exhibit to the CHFS's memorandum in support of its motion to dismiss. The clinician's affidavit, also an exhibit, states that Florida Child Protective Services provided the information from the Pinellas County Sheriff's Office, Child Protection Investigation Division, on July 1.

week the paternal aunt allowed the children to go with their parents to Florida where the paternal grandmother also resides. The clinician communicated that once contacted and told to bring the children back to Kentucky, the family attempted to obtain airline tickets as well as to repair their vehicle, but that they did not have the financial means to return to Kentucky.

The clinician, who had been communicating with Florida Child Protective Services (FCPS), also shared information provided by it on July 1. The Pinellas County Sheriff's Office, Child Protection Investigation Division (CPID), completed a background check on the father and his girlfriend (who also lived in the apartment), and found no history for either adult since moving to Florida. The father had a few reports in Kentucky, having been charged with improper display of registration plates, careless driving, possession of marijuana, and shoplifting in 2016, as well as a failure to appear in 2018. The girlfriend's last charge was in 2015 for failure to provide an insurance card. No other reports were found.

The record reflects the CPID completed a walk-through of the apartment, which it reported to be clean, but a little cramped for five children and three adults. Multiple beds were observed, and the mother had a playpen for the youngest child. The CPID observed food and running water; plenty of baby food, formula, diapers, and wipes; and a full closet of children's clothes for all ages. They saw no signs of drug paraphernalia or cigarettes. The family was acting appropriately and responding to the children's needs. The CPID reported it did not see anything concerning for the father's apartment, beyond

6

it being small.[9]  The clinician's email communication then expressed that the Cabinet is not allowed to recommend placement outside of Kentucky without an official ICPC[10] process and approval; that Cabinet administration had been contacted; and that in the meantime, the Cabinet wanted to make the Family Court aware of the current situation and seek the Family Court's input.

The clinician later clarified through an affidavit that even before she could initiate contact with Florida upon discovering that the children were there, FCPS contacted her in the 8:00 a.m. hour on July 1.  FCPS had received a report that the children were in the custody of the state of Kentucky and that the children were not allowed to leave the state of Kentucky.  To the clinician's knowledge, FCPS did not receive independent allegations of abuse or neglect but was involved solely due to the children being in Florida without permission of the Cabinet in Kentucky.[11]

The same day the clinician sent the email advising of the children's status, the GAL filed an emergency motion for production of the children to the court.  As grounds for the motion, the GAL asserted that she was in receipt of

---

[9] The clinician described the CPID report during her July 6 emergency hearing testimony.  The clinician's affidavit was filed after the July 6 hearing and contained the email text from the Florida CPID to the Bullitt County clinician describing the background checks and home visit.  The affidavit also stated that FCPS assessed the children as safe; that FCPS was involved until the children were returned to Kentucky; and that Bullitt County CPS had been in immediate and ongoing correspondence regarding the assessment of safety and planning for the children's return.

[10] Interstate compact on the placement of children.  This compact, effective until the contingency is met, is contained in KRS 615.030.

[11] The record does not reflect who reported to Florida Child Protective Services the children's presence in Florida and their status with the Cabinet.

7

email correspondence from the CHFS social worker informing the parties that the parents had taken the children to Florida despite the Cabinet having custody of the children. The motion was joined by the Bullitt County Attorney. During a hearing on the motion, the GAL requested an order for the children to be returned immediately and stated if necessary the Cabinet should secure the assistance of the Florida police.

The Family Court heard the emergency motion that afternoon. With the coronavirus (COVID-19) outbreak resulting in a global pandemic declaration by the World Health Organization and a state of emergency declaration by Kentucky Governor Beshear in March 2020, in compliance with the Kentucky Supreme Court protocols to mitigate the virus spread while maintaining access to Kentucky courts, the court conducted a remote hearing. Testimony was received by video from the clinician and another CHFS worker, the CASA Supervisor, and the father.[12] The clinician testified that after the father found out that his children were in the Cabinet's temporary custody he had reached out to the Cabinet and the Cabinet had begun evaluating placement of the children with him.[13]

The clinician also described efforts taken at that point to effectuate the children's return to Kentucky. Along with providing information contained in

---

[12] The father participated from Florida.

[13] During the July 6 hearing, the CASA Supervisor reported that on June 16 the mother told her that the father was on his way from Florida and he was going to try to get custody of the children.

the email she sent that morning, the clinician indicated that the Cabinet administration was determining the means, including air travel, by which the children could be retrieved from Florida. The clinician stated that prior to the July 4 holiday weekend, efforts were made to get airline tickets or a vehicle and that communication was maintained with FCPS over the weekend and continuing to that morning.

The clinician testified that she last saw the children on June 9,[14] while the CASA Supervisor reported that she saw the children at the paternal aunt's home the week of June 15[15] and that the mother told her that the father was on his way from Florida. The father stated that he arrived at his sister's home between June 18-20, or maybe June 23, and that he stayed for approximately seven days, leaving on June 30.

The father also stated that he did not act maliciously by taking his children to Florida and that he was leading "with his heart." The father stated that his sister's air conditioner went out while he was at her home, she had six children of her own to care for and the placement of his three young children with her was a burden for her. He noted that his intention was to be a good father and the children were his responsibility. He further stated he knew he did not have custody and that the CHFS did, but he did not have the

---

[14] The clinician later stated in an affidavit that June 9, 2020 was her monthly visit.

[15] The CASA volunteer's report filed later stated that she met with the mother and the children on June 17.

9

opportunity to speak at the first hearing.  He had talked with an attorney at the Department of Public Advocacy and did not understand why he, the dad, was not given custody; additionally, his attorney would be making motions for him. He further stated that but for his car problems, he intended to come back to Kentucky with the children on July 8.

The Family Court ordered the CHFS to return the children to Kentucky within twenty-four hours.[16]  The Family Court further ordered the CHFS to contact the Bullitt County Attorney on that same day, July 6, to initiate criminal proceedings against the parents to assist in the return of the children to Kentucky.

A case review was held July 9, 2020.  The witnesses included the CHFS Regional Family Services Supervisor, CHFS Supervisor, and the clinician. Despite dealing with COVID-19 challenges, according to testimony, the children were safely returned to Kentucky late afternoon/early evening July 8, 2020 by airplane, under the supervision of two CHFS employees, and were placed in foster care.  Testimony was taken as to the course of events following the July 6, 2020 emergency hearing.  The Family Court summation noted that

> No parties could provide any acceptable explanation as to why the
> children have remained out of CHFS custody since the emergency
> hearing on Monday.  It is not apparent that any employee of CHFS
> . . . tried to enforce [the court order placing the children in the care
> and control of the CHFS] in the State of Florida and recover these 3
> children.  Further, the witnesses verified that after the 7/6/2020

---

[16] Because, as of April 14, 2020, the Bullitt County Family Circuit Court Divisions had issued a general order requiring the CHFS to notify those divisions within one hour of discovery by the CHFS that a child is missing or has run away, the Family Court reserved a contempt ruling on the CHFS's failure to follow that order.

emergency hearing, a criminal complaint was initiated through the [Bullitt County Attorney's Office]. It was not clear that a warrant had been issued; however the parties allude to the belief that was the case. No explanation has been provided as to why a warrant has not been served upon the parents in Florida or why actions for enforcement were not implemented.

. . . .

[The clinician stated that] in regard to steps to remove the children from parents in FL, . . . she had taken no steps because she was not directed to do that. . . . Court notes this is despite CHFS having custody; custody removal from mother; the court ordering the children to be returned to KY within 24 hrs; and the court's directive to CHFS to initiate criminal action on 7/6/2020 for kidnapping, custodial interference or whatever the Commonwealth deemed appropriate given the Commonwealth was just notified 7/6/2020 as well.[17]

At the end of the July 9 hearing, the Family Court stated that it had no idea whether any additional petitions were to be forthcoming related to the allegations that were in front of the court and the parents' involvement, but the court assumed that someone was looking into that. The court expressed that there had been violation of multiple court orders, that the Cabinet had basically allowed the children to be kidnapped and not done anything about it, and that the court would address all those issues at the disposition of the case.

---

[17] The Cabinet filed a motion to alter, amend or vacate the order related to the review hearing on July 9, 2020, seeking to clarify certain factual statements made in the court's summary. In support of the motion the clinician filed an affidavit stating that the criminal complaint filed by the Cabinet was understood to be the legal action necessary to assist in the children returning, however deemed necessary.

The Family Court denied the motion because the docket order and supplemental information related to a review concerning the status of return of the children to CHFS care. The Family Court explained that a formal contempt hearing had yet to be held, and that any clarifications of previous statements and/or factual information regarding the children's chain of custody were to be addressed at that contempt hearing.

11

The next day, July 10, 2020, two other DNA petitions were filed regarding the three children in their respective cases (identified as trailers 002 and 003 of the original June 2020 DNA petition filed for each child). The CHFS filed a petition (trailer 002) alleging the children were neglected or abused by their mother and father in relation to the parents taking the children to Florida without prior CHFS approval. The GAL also filed a petition (trailer 003) alleging the CHFS neglected or abused the children, the grounds for the petition being the following:

> Despite learning that the children had been taken to Florida without the consent or knowledge of the Cabinet, the Cabinet waited until July 6, 2020 to alert the Bullitt County Attorney or Guardian ad Litem for the children. The Cabinet made no attempts to have the children taken into custody by the police in Florida. An emergency hearing was held on July 6, 2020 on the motion of the Guardian ad Litem to have the children returned to Kentucky. During said hearing, representatives of the Cabinet testified to the following: they were aware the children had been removed from Kentucky by the parents and taken to Florida; this knowledge was gained by the Cabinet on June 30, 2020; the County Attorney and Guardian ad Litem were alerted to this removal on Monday, July 6, 2020. At the hearing on July 6, 2020, the Cabinet was ordered to have the children back in Kentucky within 24 hours and they were further ordered to file criminal charges related to kidnapping and/or custodial interference against the parents. The parents were present at the electronic hearing and heard these orders. Despite the ability of the Cabinet to have the police in Florida enforce the Cabinet's custody order and immediately remove the children in Florida, the Cabinet took no steps to retrieve the children from their parents until Wednesday, July 8, 2020. For two days after the parents were made aware that they were going to be criminally charged and that the children would be returned to Kentucky, the children were left with the parents despite the Cabinet's custody order. The inaction of the Cabinet placed these children at great risk of harm.

12

Notably, the GAL stated in the petition that she "is not seeking a removal of custody from the [CHFS]."[18]  The Family Court's temporary removal order maintained the children as "[p]laced in temporary custody of [the CHFS]."  A pretrial conference was scheduled.

Before that conference, the CHFS filed a motion to dismiss arguing that the neglect petitions against the Cabinet did not state a viable cause of action against the Cabinet because the Cabinet is entitled to governmental immunity.[19]  The Bullitt County Attorney and the GAL filed written responses in opposition.[20]  The Family Court, relying on *Stratton v. Commonwealth,*

---

[18] KRS 610.050, dealing with temporary change in custody, states:

> If it appears to the court, by affidavit or by sworn testimony, that the child . . . is in such condition or surroundings that his welfare is being harmed or threatened with harm to such a degree that his best interest requires that his custody be immediately changed by the court from the original custodian to another, the judge may sign an order giving temporary custody of the child to a suitable custodian consenting to temporary custody.  However, if this case involves allegations of dependency, neglect, or abuse, no emergency removal or temporary custody orders shall be effective unless the provisions of KRS Chapter 620 are followed . . . .  The temporary custody order shall be effective until the case is heard on its merits or until modified by the court.  As a result of such order, the child shall be placed in custody and care in a home or other suitable facility.

[19] The Cabinet in the alternative requested a change of venue, the Family Court judge to recuse herself, and a neutral GAL be appointed for the children.

[20] The GAL argued:

> [I]t is an absurd prospect the CHFS could act in the role of custodian, neglect the needs of children in its care resulting in actual harm befalling the children, and then could hide behind the doctrine of governmental immunity to protect itself from a [DNA] petition.  CHFS did not raise the doctrine of governmental immunity when a petition alleging neglect was filed against it in 2014 in Bullitt Family Court . . . .  After a day-long adjudication hearing, [the Family Court] found the allegations of

*Cabinet for Families and Children*, 182 S.W.3d 516 (Ky. 2006), and *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001), denied the Cabinet's motion.

The Court of Appeals, citing *Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839 (Ky. 2019), agreed with the Cabinet that it performs an integral governmental function. But considering *University of Kentucky v. Moore*, 599 S.W.3d 798 (Ky. 2019), which holds that the state is not sovereignly immune from a declaratory judgment action in which the court is asked to declare a person's rights under a statute, the Court of Appeals analyzed whether KRS Chapter 620's statutory framework, with no potential for a monetary damage award against the state, allowed the GAL's DNA petitions against the Cabinet. The Court of Appeals concluded that in light of KRS 600.020(47) and KRS 620.070's clear language, the legislature authorized the filing of a DNA petition against the Cabinet and upheld the Family Court's

---

neglect filed against the CHFS were true. CHFS took no appeal. The case was [then prosecuted by the GAL] as an Assistant County Attorney.

Responding to the CHFS argument that she is not a neutral GAL, the GAL stated that she had great concerns for the safety of the children after the facts of this case came to light on July 6, 2020 and July 9, 2020; that she felt compelled to file a petition alleging neglect based on those facts as learned in court; that she is not attempting to gain custody of the children; and that she simply believes that based upon the facts as presented, that a finding should be made.

In its order denying the Cabinet's motion to dismiss, the Family Court stated that "the Cabinet may not cherry pick when it chooses to invoke this alleged immunity. The history of this jurisdiction includes at least three prior cases, in the other [Family Court division], wherein CHFS was found to have neglected children placed in its care and custody by the Court."

If indeed the 2014 petitions against the Cabinet sought only a finding of neglect, it appears they suffered a deficiency similar to the current petitions at issue.

14

decision.  After noting the "unusual" procedure of separate DNA actions against the Cabinet, the Court of Appeals stated: "It is seldom necessary to file a new petition against the Cabinet because the court retains jurisdiction over the terms of placement and custody of the children."

This Court granted the Cabinet discretionary review.  The Cabinet continues to maintain that it is entitled to governmental immunity, disagreeing with the Court of Appeals' analysis that the General Assembly waived the Cabinet's right to governmental immunity in DNA matters.  Again, we do not reach that issue because the GAL's new DNA petitions were procedurally improper in the first instance.

## ANALYSIS

The Kentucky General Assembly directs that the Kentucky Unified Juvenile Code, KRS Chapters 600 to 645, shall be interpreted to effectuate the purposes expressed in KRS 600.010(2), the first listed purpose being that "[t]he Commonwealth shall direct its efforts to promoting protection of children." KRS 600.010(2)(a).  The General Assembly also pronounced that because "[c]hildren have certain fundamental rights which must be protected and preserved, including but not limited to, the rights to adequate food, clothing and shelter; the right to be free from physical . . . or emotional injury . . . and the right to a secure, stable family," sometimes it is necessary to remove a child from his or her parents in order to protect and preserve the rights and needs of children.  KRS 620.010.  The Commonwealth's policy is that "in order to [e]nsure that children are not removed from families except when absolutely

15

necessary," "the court shall show that other less restrictive alternatives have been attempted or are not feasible."  KRS 600.010(2)(c).

In accordance with the purpose of promoting protection of children and pertinent to the allegations in this neglect/abuse case,[21] KRS 620.070 and KRS 600.020(1)(a)2 read together allow "any interested person" to file a petition alleging that the child's "parent, guardian, person in a position of authority or special trust, . . . or other person exercising custodial control or supervision of the child" harmed or threatened harm to the child's health or welfare by "creat[ing] or allow[ing] to be created a risk of physical or emotional injury[22] . . . to the child by other than accidental means."

"Position of authority," "position of special trust," and "person exercising custodial control or supervision" are defined terms.  *See* KRS 600.020(1)(a), KRS 600.020(47).  "Position of authority" means but is not limited to

> the position occupied by a biological parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational staff, or volunteer who is an adult, adult athletic manager, adult coach, teacher, classified school employee,

---

[21] According to KRS 600.020(20), a child may be either a "dependent child" or an "abused or neglected child," but not both.  "Dependent child" means "any child, other than an abused or neglected child, who is under improper care, custody, control, or guardianship that is not due to an intentional act of the parent, guardian, or person exercising custodial control or supervision of the child."  *Id.*  Although this is a neglect/abuse case, references to the similar procedure dependency action are maintained in certain quoted statutes below.

[22] Within the Unified Juvenile Code, "physical injury" means "substantial physical pain or any impairment of physical condition," KRS 600.020(49), and "emotional injury" means "an injury to the mental or psychological capacity or emotional stability of a child as evidenced by a substantial and observable impairment in the child's ability to function within a normal range of performance and behavior with due regard to his or her age, development, culture, and environment as testified to by a qualified mental health professional," KRS 600.020(26).

16

certified school employee, counselor, staff, or volunteer for either a residential treatment facility or a detention facility as defined in KRS 520.010(4), staff or volunteer with a youth services organization, religious leader, health-care provider, or employer.

KRS 532.045(1)(a). "Position of special trust" means "a position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the minor." KRS 532.045(1)(b). A "person exercising custodial control or supervision" is "a person or *agency* that has assumed the role and responsibility of a parent or guardian for the child, but that does not necessarily have legal custody of the child." KRS 600.020(47) (emphasis added).

With KRS 600.020(47) using the broad "agency" term and not limiting the agency which may assume the role and responsibility of a parent or guardian for the child, and KRS 600.020(13) defining "commitment" as "an order of the court which places a child under the custodial control or supervision of the Cabinet for Health and Family Services, Department of Juvenile Justice, or another facility or agency until the child attains the age of eighteen (18) unless otherwise provided by law," the Court of Appeals concluded that the Cabinet, an agency having temporary custody of the children, met the definitional requirement of a "person exercising custodial control and supervision" and, consequently, a DNA action could properly be filed against it. While the definition of the term "commitment" makes evident that the CHFS may exercise custodial control and supervision in a given

17

matter, at the point the GAL filed these DNA petitions against the Cabinet the proceedings had yet to reach adjudication of whether the children were neglected or abused, KRS 620.100(3), and accordingly had yet to reach disposition, at which point a child may be committed to the Cabinet, KRS 620.140(1)(d); *see also* KRS 620.090(6), KRS 620.100(4). Even though the children had not been committed to the Cabinet, the petitions against it were still arguably allowed under KRS 600.020(1)(a)2 because the Cabinet had "assumed the role and responsibility of a parent or guardian" for the children as provided in KRS 600.020(47). To the extent it had temporary custody, the Cabinet can be said to occupy that role although the paternal aunt was the person charged with their day-to-day care under Cabinet supervision.

In its motion to dismiss the GAL's petitions, the Cabinet did not argue that it was not a person exercising custodial control and supervision but instead argued it was governmentally immune from the GAL's neglect claims against it. Again, the circumstances here do not support the GAL's DNA petitions, not necessarily because the Cabinet is governmentally immune from a DNA petition (a question that is not properly before us in this case), but because the GAL's allegations against and dissatisfaction with the Cabinet's efforts to return the children to Kentucky could be, and in fact were, properly dealt with in the context of the original actions filed by the Cabinet on behalf of each child. As with a show-cause/contempt proceeding, *see Cabinet for Health and Fam. Servs. v. J.M.G.*, 475 S.W.3d 600, 615 (Ky. 2015), the record pertinent to disposition of the GAL's allegations against the Cabinet is

18

contained within the original case.[23]  Stated simply, everything underpinning

the new DNA petitions came directly and solely from events occurring under

the pending petitions after the Cabinet was granted temporary custody.

The Court of Appeals ended its opinion stating:

[W]e must note that it is unusual to bring a DNA petition against
the Cabinet.  It is seldom necessary to file a new petition against
the Cabinet because the court retains jurisdiction over the terms of
placement and custody of the children.  In addition, the court
possesses the inherent authority to enforce its orders against the
Cabinet through the use of its contempt powers.  *See Cabinet for
Health and Fam. Servs. v. J.M.G.*, 475 S.W.3d 600, [618-19] (Ky.
2015).[24]  For these reasons, we express no opinion concerning the
merits of the GAL's petitions in this case or the scope of any
available remedy.  Those are matters which must be decided upon
later adjudication by the family court.

While the appellate court noted the oddity of the situation and somewhat

reluctantly addressed the Cabinet's governmental immunity, we go a step

further and reiterate that the GAL's new DNA petitions against the Cabinet

were procedurally improper in the first instance.

The primary or initial objective of a KRS Chapter 620 neglect or abuse

action is to determine if a child is receiving proper parental care, but if the

---

[23] Although it may seem the GAL may have been better served by filing a motion for contempt, without allegations that the Cabinet violated a court order, the allegations within the DNA petition are not sufficient for that procedure. *Commonwealth, Cabinet for Health and Fam. Servs. v. Ivy*, 353 S.W.3d 324, 332 (Ky. 2011) ("In a civil contempt proceeding, the initial burden is on the party seeking sanctions to show by clear and convincing evidence that the alleged contemnor has violated a valid court order.").  Furthermore, as noted in *J.M.G.*, 475 S.W.3d at 616, the possibility of proceeding against the Cabinet as an entity in a contempt proceeding, as opposed to individual Cabinet employees, is something this Court has never addressed.

[24] *But see* n.23, *supra.*

19

parent is not exercising custodial control and supervision, then that the person exercising custodial control and supervision (OPECCS) is providing proper care to the child. *See* KRS 620.010, KRS 600.020(1)(a), KRS 620.070. The petition, a verified statement, sets forth allegations in regard to the child and initiates formal court involvement in the child's case. KRS 600.020(48); KRS 610.020.[25] The petitioner, making the petition in the interest of the child, KRS 610.020, KRS 610.060, may request the child's removal from the parent or the OPECCS, as the case may be.[26] Unless waived by the child and his parent or OPECCS, a temporary removal hearing is held. KRS 620.080(1).[27] The court then determines at the hearing "whether there are reasonable grounds to believe that the child would be dependent, neglected or abused if returned to or left in the custody of his parent or [OPECCS] even though it is not proved conclusively

---

[25] KRS 610.020(1) provides in part:

Except as otherwise provided in KRS Chapters 600 to 645 . . . [t]he complaint and all subsequent court documents shall be entitled: "In the interest of . . . , a child." The complaint shall be verified and may be upon information and belief. It shall set forth plainly:

(a) The facts which bring the child within the purview of KRS Chapters 600 to 645; . . . .

[26] The request for emergency, immediate removal may be made pursuant to KRS 620.060(1). When emergency custody is granted, "[c]ustody may be placed with a relative taking into account the wishes of the custodial parent and child or any other appropriate person or agency including the cabinet." KRS 620.060(2).

[27] When emergency custody is granted, the hearing is held "[w]ithin seventy-two (72) hours, excluding weekends and holidays, of the time when an emergency custody order is issued or when a child is taken into custody without the consent of his parent or other person exercising custodial control or supervision." KRS 620.080(1)(a). When the case is commenced by the filing of the petition, the temporary removal hearing is held within ten (10) days of the date of filing. KRS 620.080(1)(b).

who has perpetrated the dependency, neglect or abuse." KRS 620.080(2). The Commonwealth bears the burden of proof by a preponderance of the evidence and if the Commonwealth fails to establish the dependency, neglect or abuse, the child is to be released to or retained in the custody of his parent or OPECCS. KRS 620.080(2).

> If, after completion of the temporary removal hearing, the court finds there are reasonable grounds to believe the child is dependent, neglected or abused, the court . . . issue[s] an order for temporary removal and . . . grant[s] temporary custody to the cabinet or other appropriate person or agency. Preference [is] given to available and qualified relatives of the child considering the wishes of the parent or [OPECCS], if known.

KRS 620.090(1). "The child . . . remain[s] in temporary custody with the cabinet [no longer than] forty-five (45) days from the date of the removal from his home." KRS 620.090(6).[28] Within that forty-five (45) days, "[t]he court . . . conduct[s] the adjudicatory hearing[29] and . . . make[s] a final disposition." KRS 620.090(6).[30] "The disposition . . . determine[s] the action to be taken by the court on behalf of the child and his parent or [OPECCS]." KRS

---

[28] At the time the DNA petitions were filed, this provision was codified in KRS 620.090(5). Its recodification under KRS 620.090(6), 2021 Ky. Acts ch. 47, § 5, was effective June 29, 2021.

[29] "The adjudication shall determine the truth or falsity of the allegations in the complaint. The burden of proof [belongs to] the complainant, and a determination of dependency, neglect, and abuse [is] made by a preponderance of the evidence." KRS 620.100(3).

[30] "The court may extend such time after making written findings establishing the need for the extension and after finding that the extension is in the child's best interest." KRS 620.090(6).

620.100(4).[31]  "An order of temporary custody to the cabinet" is expressly

mentioned as "not . . . a permissible dispositional alternative."  KRS

620.140(2).

On their face, in terms of an injury allegation, the GAL's DNA petitions,

alleging the Cabinet placed the three children at risk of harm, may appear

sufficient to state a cause of action against the Cabinet.  The GAL took issue

with the Cabinet's delay in informing the GAL and the Family Court that the

children had been taken to Florida, not involving the Florida police in securing

---

[31] Potential dispositions for children under eighteen include informal adjustment of the case by agreement, which may be entered into at any time.  For example, "[i]nformal adjustment may include an agreed plan by which . . . [t]he parent or [OPECCS] agrees that grounds exist for a finding of dependency, neglect, or abuse, and agrees to the conditions of protective orders under [KRS 620.140(1)(b)] for a duration of up to one (1) year."  KRS 620.140(1)(a)1 (as amended by 2021 Ky. Acts ch. 79, § 1, effective June 29, 2021).

Other potential dispositions are protective orders, such as "placing the child in his or her own home under supervision of the cabinet or its designee with services as determined to be appropriate by the cabinet," KRS 620.140(1)(b)2; "[r]emoval of the child to the custody of an adult relative, fictive kin, other person, or child-caring facility [as defined in KRS 600.020(10)] or child-placing agency [as defined in KRS 600.020(11)], taking into consideration the wishes of the parent or [OPECCS]," KRS 620.140(1)(c); and "[c]ommitment of the child to the custody of the cabinet for placement for an indeterminate period of time," KRS 620.140(1)(d).

While KRS 620.140 provides some flexibility with the determination of the disposition, some provisions are mandatory if certain dispositions are chosen.  For example, before any child is

> placed out of his or her home under the supervision of the cabinet, the court shall determine that reasonable efforts have been made by the court or the cabinet to prevent or eliminate the need for removal and that continuation in the home would be contrary to the welfare of the child.

KRS 620.140(1)(c).  This determination is also required before any child is committed to the cabinet.  *Id.*  However, some parental circumstances negate the requirement that reasonable efforts (as defined in KRS 620.020(13)) be made to reunify the child with the family.  KRS 610.127.

22

the children (even though Florida CPS had no concerns about their living conditions or treatment) and taking forty-eight hours to return the children to Kentucky (instead of the twenty-four hours ordered by the court). Significantly, however, the petitions state that the GAL "is not seeking a removal of custody from the Cabinet for Health and Family Services." While the requested relief, or more accurately the lack thereof, on its own suggests a lack of a justiciable controversy, *see Commonwealth Cabinet for Health & Fam. Servs., Dep't for Medicaid Servs. v. Sexton by & through Appalachian Reg'l Healthcare, Inc.*, 566 S.W.3d 185, 195 (Ky. 2018), the preceding review of KRS Chapter 620's purpose and framework for protecting children and the review of the record make clear that the GAL's DNA petitions were improper and unnecessary. While perhaps encouraged by the Family Court's suggestion at the end of the July 9 hearing that other petitions were expected, these unnecessary petitions diverted attention and resources from the central issue of the children's care and safety to the speed and effectiveness of the Cabinet's response when it learned the paternal aunt had allowed the children to leave the state. This foray expended trial and appellate court resources, including this Court's, unnecessarily. Any concerns about the Cabinet's response to this situation could have been raised by the GAL or the Family Court *sua sponte* in the existing DNA proceedings and in fact they were so raised.

On July 6, the GAL filed an emergency motion in those original cases, asking the Family Court to order either the mother or the Cabinet to produce the children, *i.e.,* seeking their return from Florida to Kentucky. The Family

23

Court granted relief and although that return occurred in forty-eight hours rather than twenty-four,[32] the children were returned unharmed and then placed by the Cabinet in foster care. Nevertheless, the GAL disagreed with the Cabinet's handling of the children's cases upon learning that the parents had taken the children to Florida[33] and disagreed especially with the lack of police intervention in Florida to remove the children swiftly from the parents and return them to Kentucky. Despite the fact that the children were returned safely and placed in foster care on July 8, the GAL filed three new DNA petitions against the Cabinet on July 10—two days after the children were back in Kentucky. At that point, the GAL's concerns for the children's safety as a result of being with their parents, and criticisms of the Cabinet's manner of effectuating their return from Florida without police involvement, even if deemed an appropriate basis for a DNA petition, were largely moot. If the Cabinet was irresponsibly lax in reporting the children's absence or securing their return, if deferring to Florida Child Protective Services' judgment regarding the children's safety instead of involving Florida police or any other aspect of this incident was problematic, those issues were properly addressed

---

[32] It appears that it took two days because of CHFS administrative requirements and COVID-19 impacting airline reservations. Two Cabinet workers flew to Florida and returned the children within approximately forty-eight hours of when the Family Court ruled. We note that in the interim the children were with both parents in a home that had been deemed by Florida child protection authorities to be safe and presenting no concerns.

[33] As noted previously, the Family Court had already reserved contempt proceedings as to the CHFS failure to comply with the April 2020 general order and timely notify the Family Court that the children were missing.

in the existing DNA cases—the cases which had resulted in the Cabinet having temporary custody of the children in the first place. In so noting the authority of the Family Court to address those issues if appropriate and necessary on remand, we emphasize that any contempt proceeding would have to comply with the procedures identified and discussed in *Cabinet for Health and Family Services v. J.M.G.*, 475 S.W.3d 600 (Ky. 2015), and be premised on violation of a court order.

In closing, this case is more than a little perplexing. The Cabinet did not condone the parents taking the children out of the state and because it cannot constantly supervise every placement, it cannot be held responsible for the paternal aunt allowing the children's parents to take them to Florida. Should the Cabinet have learned of that trip earlier, perhaps by more closely monitoring the paternal aunt's home? Should it have notified the court on July 1 when it learned the children were in Florida instead of waiting until July 6 even though Florida Child Protective Services was on notice and had found the children to be in safe conditions as of July 1? Was contacting Florida police to enforce the court's custody order necessary and appropriate in these circumstances? These and other questions can be addressed in the context of the original DNA proceedings. As for the GAL's DNA petitions, they should have been dismissed at the outset for the reasons outlined in this Opinion.

## CONCLUSION

Having carefully reviewed the record in this matter, we vacate both lower courts' orders and remand to Bullitt Family Court for dismissal of the GAL's petitions against the Cabinet.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Jennifer Ellen Clay
Cabinet for Health & Family Services
Office of Legal Services

COUNSEL FOR APPELLEES,
TAMMY BAKER; K.T., DAUGHTER;
K.T., SON 1; AND K.T., SON 2:

Tammy Renee Baker

COUNSEL FOR APPELLEE,
BULLITT COUNTY ATTORNEY'S
OFFICE:

Joshua Richard Bolus
Assistant County Attorney

COUNSEL FOR APPELLEE,
M.H., MOTHER:

John E. Spainhour, Jr.
Givhan & Spainhour, PSC

COUNSEL FOR APPELLEE,
K.T., FATHER:

James Robert Miller